## PLEDGER *v.* BIRKHEAD.

Opinion delivered January 15, 1923.

1. APPEAL AND ERROR—TESTIMONY TAKEN BY MASTER—AUTHENTICATION.—Testimony taken by a master is sufficiently identified where he files a report in court, certifying the names of the witnesses, that the stenographer correctly transcribed all of the testimony offered by both parties, and that the testimony so taken was filed in court.

2. MASTER—FAILURE TO AUTHENTICATE TESTIMONY—EXCEPTION.—Failure of a master appointed to take testimony to authenticate depositions taken before him and filed with his report should be brought to the court's attention by exceptions to the master's report.

3. APPEAL AND ERROR—DEPOSITIONS—AUTHENTICATION.—A recital in a decree that all the evidence in the case was reduced to writing *held* sufficient to identify a deposition taken *ore tenus* before the court, reduced to writing and duly authenticated.

4. DEEDS—MENTAL CAPACITY.—If the maker of a deed, will or other instrument has sufficient mental capacity to retain in his memory without prompting the extent and condition of his property and to comprehend how he is disposing of it and to whom and upon what consideration, then he possesses sufficient mental capacity to execute the instrument, in the absence of fraud, duress or undue influence, and mental weakness alone, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him.

5. DEEDS—MENTAL WEAKNESS.—Mental weakness, though not to the extent of incapacity to execute a deed, may render a person more susceptible of fraud, duress or undue influence, and, when coupled with any of these or even with unfairness, such as great inadequacy of consideration, may make an instrument voidable, when neither such weakness nor any of these other things alone would do so.

6. DEEDS—PRESUMPTION OF CAPACITY.—In a suit to set aside a deed because of the grantor's mental incapacity and because of fraud and undue influence, the grantor's capacity is presumed, and the burden is on the plaintiff to establish the allegation of his complaint.

7. DEEDS—WANT OF CAPACITY OF GRANTOR—EVIDENCE.—In a suit to set aside a deed on account of the grantor's mental incapacity and of the grantees' fraud and undue influence, evidence *held* insufficient to sustain finding that grantor did not have sufficient mental capacity to make the deed, or that the deed was procured by fraud or undue influence.

Appeal from Logan Chancery Court, Northern District; *J. V. Bourland*, Chancellor; reversed.

*Jno. B. Crownover* and *Hays, Ward & Hays*, for appellant.

Proof which is designed to invalidate a man's deed or contract, must show inability to exercise reasonable judgment in regard to the matter involved in the conveyance, such as to prevent him from understanding the nature and consequences of his act. 70 Ark. 166; 1 Elliott on Contracts, sec. 365.

The burden of proof to establish mental incapacity is upon the one attacking the conveyance. The law presumes there is full capacity to contract. 1 Elliott on Contracts 265; 142 Ill. 368. Such proof must be full, clear and decisive. 71 Ark. 617; 96 Ark. 264.

The disposition made by Garrison of the land was a natural one, the terms were of his own choosing, and no undue influence was exerted in procuring the deeds. 49 Ark. 371; 13 Ark. 475; 19 Ark. 551. To show undue influence it is not sufficient to show that the appellants were members of Garrison's household and perhaps enjoyed confidential relations with them, but there must be a malign influence, the result of fear, coercion, or any other cause which would deprive him of his free agency in disposing of the property. See 78 Ark. 420; 29 Ark. 157; 44 W. Va. 612; 118 U. S. 127. See also 119 Ark. 466.

The $700 in suit was at no time the separate property of Garrison, but belonged to his wife.

Appellee is barred by laches. 55 Ark. 85.

The findings of the chancellor are persuasive merely and not binding. 130 Ark. 465; 151 Ark. 474.

*Robt. J. White*, for appellees.

Garrison was mentally incompetent to make a deed to the lands involved under the tests laid down in 60 N. E. at p. 885; 171 S. W. (Ark.) 890; 70 Ark. 166. The deeds should be set aside on the ground of undue influence.

Appellants occupied a fiduciary relation to Garrison as defined in Second Series, Words & Phrases, vol. 2, p. 229 and cases cited. See also 2 Pom. Eq. (3rd ed.) 956; 103 N. W. 632; 69 L. R. A. 409; 1 Pom. Eq. Jur. 218; 223 S. W. (Ark.) 561; 225 Ill. 629. The same undue influence prevailed in the execution of the will. Here we have a mentally incompetent person conveying property for a grossly inadequate consideration, and equity will intervene to restore to him his property. 118 N. E. 543; 15 Ark. 555; 84 Ark. 490; 150 S. W. (Ark.) 117. See also cases in point in 241 Fed. 311; 111 N. E. 287.

WOOD, J. On the 12th day of February, 1901, George J. Garrison and his wife, Susan, executed to William Pledger a warranty deed conveying to Pledger certain lands therein described, consisting of about thirty-two acres in Logan County, Arkansas, for the consideration of $60, to be paid on the first of November of each year thereafter so long as Garrison or his wife lived; and also a warranty deed to Harvey Pledger, conveying to him certain lands described therein, consisting of about forty-three acres in Logan County, Arkansas, for the consideration of $65 to be paid on the first day of November of each year thereafter so long as Garrison or his wife lived.

This action was instituted by the appellee, as guardian ad litem and next friend of George J. Garrison, against the appellants to set aside the deeds mentioned and to recover the sum of $1,000 which he alleges came into their hands from rents and sales of property of George Garrison, and which they refused to pay over. The grounds alleged for canceling the deeds were, first, that Garrison did not have sufficient mental capacity to make the deeds, and, second, that the deeds were executed through fraud and undue influence of the appellants. The appellants denied the allegations of the complaint as to fraud and undue influence, and denied that they had in their possession any money belonging to George J. Garrison.

The testimony of all the witnesses, except that of George J. Garrison, was taken before a master in chancery, who was duly appointed and sworn for that purpose under the provisions of chapter 118 of Crawford & Moses' Digest. The master's report, filed June 7, 1921, shows that he engaged a stenographer and took all the testimony and evidence offered by both plaintiff and defendants bearing on the issues involved in the cause; that the same was transcribed and certified by him as special master and filed in court. Included in the report were the names of the witnesses whose testimony the master stated he had transcribed and certified. The decree recites as follows: "Now on this the 8th day of June, 1921, this cause was submitted * * * pursuant to stipulations in writing made on the 20th of April, 1921, by virtue of which this cause, with all the testimony and all the pleadings and papers, is to be on the 8th of June, 1921, thus submitted for consideration, to be finally decided at the September, 1921, term * * *, and now on this day of the regular September, 1921, term * * * this cause was submitted to the court for consideration, upon the pleadings and papers and depositions of witnesses filed in this cause, all the evidence herein being in writing * * *. And the court doth find from the pleadings, depositions and all the papers filed in the cause," etc. * * * Then follow the findings of the court.

It appears that the testimony of George J. Garrison was taken before the court and by order of the court reduced to writing by the stenographer who took the same, and filed with the clerk of the court, and is designated in the transcript as the "testimony of George J. Garrison, taken before Hon. J. V. Bourland, chancellor, at Fort Smith on June 8, 1921." The clerk of the chancery court certifies that the foregoing pages, numbering them from 1-693, inclusive, "contains a true, perfect, and complete transcript of all the pleadings and exhibits thereto, record entries and proceedings, and all of the evidence taken and filed in the cause * * * as the same now

appears on file and of record in my office, all the testimony being taken before George A. Hall, special master, and reduced to writing under his direction, and no oral evidence being introduced in the cause.''

Among other things the court found that George J. Garrison was mentally incapable of executing the deeds mentioned, and that these deeds were executed ''through over-persuasion and undue influence fraudulently exerted over George J. Garrison by the appellants.'' The court further found that the appellants had in their possession the sum of $700 which was the property of Garrison. The court thereupon entered a decree in favor of the appellee against the appellants, canceling the deeds mentioned above, and for the sum of $700, with interest from the date of the decree. From that decree is this appeal.

The appellee moved to affirm the cause on the following grounds: first, that the papers and writings purporting to be the depositions taken and heard in this cause are not now parts of the record as filed in this court; second, ''that the testimony of George J. Garrison was taken *ore tenus* before the court, and that the same has not been properly authenticated and brought into the record.''

(a) The motion to affirm on these grounds must be overruled for the reason that the record shows that all of the testimony in the cause, except that of George J. Garrison, was taken before the master in chancery, who was duly appointed for that purpose, and who had reported that he had taken all the testimony of the witnesses, naming them, and had transcribed and filed the same in court. This was a sufficient identification and authentication of the testimony taken in the cause before the master. His report shows that the testimony so taken by him in the cause was filed in the court. The recitals of the decree show that the cause was submitted upon the ''depositions of witnesses filed in this cause, all the evidence herein being in writing.'' But, even if the report of the master and the recitals of the decree,

as above set forth, were not sufficient to properly authenticate the testimony taken by the master and heard by the trial court, the appellee raised no objection before that court, either as to the manner of the taking of the testimony or to its identification. The provisions of chapter 118 of C. & M. Digest, under which the master in chancery was specially designated to take this testimony, clearly contemplates that any defects or irregularities of the sort herein complained of shall be brought to the attention of the trial court by exceptions to the master's report. *Johnson* v. *Meyer,* 54 Ark. 437; *Goodrum* v. *Merchants' & Planters' Bank,* 102 Ark. 326, 341, 342.

(b) As to the testimony of George J. Garrison, it occurs to us that the recital of the decree to the effect that the cause was submitted upon "all the evidence herein being in writing," was sufficient to identify the testimony of Garrison. The record entries are sufficient to show that the court heard the testimony of Garrison *ore tenus;* that this testimony was reduced to writing and duly authenticated, as shown by order of the court directing that same be filed as part of the testimony upon which the cause was heard. Such we conclude to be the effect of the recital of the decree that all of the evidence upon which the cause was submitted was reduced to writing.

2. The testimony on the issues as to whether or not Garrison had mental capacity sufficient to enable him to execute the deeds, and whether or not he was induced by fraud or undue influence on the part of the appellants to make the same, covers nearly nine hundred pages of the transcript. Therefore it is wholly impracticable for us to set out and discuss in detail the testimony on these issues. About twenty-five witnesses testified for the appellee on these issues and about the same number for the appellants. There is a hopeless conflict in the testimony of these witnesses. It will be sufficient to set out the testimony of one

Virgil Griffin, which is substantially typical of the testimony of all the witnesses, except the experts, as to Garrison's mental capacity.

Griffin testified that he had known Garrison all of his life. He lived by him and was intimately associated with him; knew his first wife, who transacted most of his business for him. Simeon Pledger attended to his business after his first wife's death, and until he married the last time, after which his second wife and her boys and Uncle Thad Johnson attended to it. Garrison was weak-minded as far back as witness could remember, and was not capable of attending to the ordinary business transactions of a farmer. Witness never know of his being trusted to transact any business alone. Garrison was witness' great uncle. While Garrison had the seventy-five acres in controversy it rented for $5 or $6 per acre. Most of it was in cultivation. The boys (appellants) attended to his business. He did not attend to it himself. They loaned his money for him. Garrison would not make a horse trade without his wife's consent. It was generally understood that Garrison consulted his family about all his business.

All of the witnesses for the appellee, who testified as to Garrison's mental capacity, were of one voice in saying that he did not have average intelligence and could not attend to business properly and like a man of average intelligence. The effect of their testimony was that he had a mind so simple and his mental condition was so feeble that he was incapable of transacting ordinary business affairs without consultation and assistance.

Three physicians qualified as experts and testified on behalf of the appellee. One of these testified that he had known Garrison for twenty years and had, in a general way, during that time, observed his mental condition, his personal appearance and general conduct when he would meet Garrison in crowds; that, within the last

six months before giving his testimony, he had given Garrison close and expert examination with a view to ascertaining his physical and mental condition, and in August, 1920, had examined him in connection with two other physicians. This examination disclosed a peculiar type of facies which the witness described, and stated that the characteristics all indicated that Garrison was a man of mental inferiority. The witness further stated that, upon asking him questions, they discovered from his answers that he was very simple-minded, the language of the witness being that "he (Garrison) is a high-grade feeble minded person, or a low-grade moron, and has never in his life been anything higher than a moron, with the mental development of a child twelve or fourteen years old." After further describing his conduct and personal appearance, which he said he had observed in Garrison for practically thirty years, he gave it as his opinion that Garrison "would be no more competent in a business transaction than a child twelve or fourteen years old, and had not sufficient mentality and will power to protect himself in such transactions against persons of average intelligence." In witness' opinion such was his mental condition in 1901, when the deeds were executed.

The two other experts who assisted in the examination had not known Garrison so long, but one of them corroborated substantially the testimony of the other expert as to Garrison's mental condition at the time of the execution of the deeds.

On the other hand, the witnesses who testified on behalf of the appellants, who were equally well acquainted with Garrison, and had been closely associated with him in the life of the community, were equally positive that Garrison had sufficient mental capacity to enable him to transact ordinary business affairs. They all testified that Garrison was an uneducated man, that many people had stronger minds, but that he had judgment and business capacity to attend to the ordinary affairs of a small

farmer such as he was. These witnesses testified that
Garrison took an interest in the public affairs of the com-
munity. He would vote at elections, and had his partisan
preferences as other ordinary voters. Many of these
witnesses testified that Garrison took an active interest in
church life; that he was a regular attendant, and was
often called upon by the preachers to lead in prayer. He
was one time a member of the Presbyterian church and a
ruling elder of that church. He was designated as a mes-
senger for the purpose of securing a pastor. He was a
member of the Odd Fellows lodge, and held an office in
the lodge; was a constant attendant at its meetings, and
was one time warden and another time chaplain of the
lodge. He had memorized the ritual so as to enable him
to properly perform the functions of those offices. He
became a member of the lodge two years after the ex-
ecution of the deeds. In the years 1901 and 1902 Garri-
son served for a whole term on the regular panel of the
petit jury. At least a dozen witnesses testified that they
had had business transactions with Garrison. The testi-
mony of these witnesses tended to show that Garrison
conducted the business for himself in the ordinary bus-
iness transactions such as a farmer in his situation would
have. One of the members of a firm of merchants with
whom Garrison traded from the years 1890 to 1913, in-
clusive, testified that Garrison would buy goods from his
firm for cash and on credit, sometimes alone, and some-
times members of the family would be with him. This
merchant stated that he looked after his customers and
took a personal interest in them. One of the clerks in
this store who sold Garrison goods between the years
1900 and 1904 stated that Garrison bought merchandise
close, was a good trader, and if the stuff was not priced
right they couldn't sell it to him. This clerk was over
fifty years old, and had known Garrison since he was a
boy. He was a good customer and a good man. It
never crossed the witness' mind that anything was
wrong with his mental condition.

A clerk at another store at which Garrison traded during the years 1916 and 1917 testified that he sold Garrison lots of goods, and that he would usually pay cash for same, though his credit was A-1. The witness had an opportunity in that way of engaging in conversation with Garrison and of judging his mental capacity, and he stated that it was just as good as that of any ordinary countryman. He often bought goods by himself, and was a good trader.

The lawyer who drew the deeds in question and a contract that was executed at the same time by the appellants to Garrison, testified substantially that Garrison and the appellants came to his office together to talk over with him the sale they had made, and requested him to draw up the deeds and contract to conform thereto. Garrison stated at the time that he didn't want to be bothered with handling the place, and wanted the boys to take it and pay him so much a year; that he would be satisfied if they paid him that much as long as he lived, or his wife lived, in case of his death. Witness further stated that Garrison seemed perfectly satisfied with what he was getting for the land. Witness was asked whether, in his opinion, Garrison knew and comprehended and was able to take care of himself in that transaction, and answered, "Well, he impressed me as being just as capable of taking care of himself as the others did. I couldn't see but what they were dealing on perfectly equal terms, so far as mental capacity was concerned." This witness had known Garrison about forty years.

There was testimony on behalf of the appellee tending to prove that the land in controversy was worth at the time of the sale from $2,500 to $3,000, and there was testimony on behalf of the appellants tending to show that the land at that time was not worth more than the sum of $1,250. This is the value which the parties to the deeds at the time placed upon the lands.

In 1885 Garrison married Susan Pledger, the mother of the appellants. In 1886 Garrison executed a will in which he bequeathed to his wife, Susan, and her bodily heirs by him, if any, all of his property, real and personal; and in case they had no children, to his wife and her children. It was shown that the family relations, after Garrison's intermarriage with the mother of the appellants, were always pleasant. He treated, appellants and their sister as his children, and they treated him as a father. At the time of the marriage William Pledger was fourteen, Harvey Pledger was ten, and their sister was twelve.

The above we believe to be a substantial resume of the testimony of the witnesses, outside of the parties themselves to the transactions. Garrison's testimony was taken before the court at the hearing. At this time he was in his seventy-ninth year. Six or seven years before he had fallen from the porch at his home, and since that time, according to the testimony of his physician, he had broken rapidly in health and was not the man, mentally or physically, that he was when the physician first knew him, nine years before. The physician who gave this testimony was also one of the doctors who made the special examination of Garrison to determine his mental condition. He did not communicate this information to the other physicians at the time they were examining Garrison.

The testimony of several other witnesses, who had known Garrison many years and were closely associated with him, corroborated the testimony of the physician as to his then mental and physical condition. The family physician, who had known Garrison nine years, did not concur with the other doctors in their classification. He "did not think Garrison was ever a man of average intelligence; that he had never developed beyond the mentality of a boy of fifteen years of age." In his opinion the average man should be able to read and write and attend to ordinary business affairs. He had observed men who

were able to attend to their business who had no education at all. He was asked whether Garrison's mental condition was below the totally uneducated man of ordinary common sense, and answered, "I don't know as I can answer. It's hard for me to tell what his mental condition would be if he had a good education. If he had been given proper education he would have been better than he is today." Witness further stated that he did not think Mr. Garrison was up to the average in attending to business properly, but a great many good men couldn't do that, and his answer would have to be conditioned by his personal knowledge of him since his acquaintance.

The testimony of Garrison, without setting it forth in detail, was to the effect that he didn't remember about the deeds being written in Dardanelle. Many other of the facts relating to the transaction he didn't remember. He made the deeds because his wife and the boys (appellants) wanted him to. He didn't want to make the deeds for the consideration of $125 per year, but did so because they insisted on it, and had been insisting on it for two or three years. At another place in his testimony he said that he loved the appellants' sister as if she had been his own child, and also loved the appellants; that they tried to help him, and he tried to help them. He stated he wanted to see appellants make good and successful men. In further stating why he sold the land to them he said that it was a good piece from his home, and he did not like to go back and forth to work it. He was asked this question: "You just wanted William and Harvey to have it?" and answered: "I thought it was best for them to have it."

The testimony of the appellants was to the effect that their relations with their stepfather had always been pleasant. He approached the appellants upon the proposition of buying the place. He valued it at $1,250. They were willing to pay that for it, the payments to be made in four or five years, but to this Garrison demurred, and

proposed to sell upon the terms named in the deeds. They finally accepted his proposition, and it was understood that at his and their mother's death the appellants should pay their sister out of the consideration the sum of $416. Their testimony shows that they had complied with the terms of the deeds on their part by paying the consideration named therein to Garrison as long as he would receive the money, and had proffered the payments due just before the institution of this suit, which Garrison refused to accept.

The familiar principles of law applicable to cases of this kind have often been announced by this court. If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what consideration, then he possesses sufficient mental capacity to execute such instrument. Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting his own interest in dealing with another is all the law requires. If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him. *McCulloch* v. *Campbell,* 49 Ark. 367; *Seawell* v. *Durst,* 70 Ark. 166; *Taylor* v. *McClintock,* 87 Ark. 243-247; *McIlroy* v. *Tucker,* 115 Ark. 430.

But mental weakness, though not to the extent of incapacity to execute the instrument designated, "may render a person more susceptible of fraud, duress, or undue influence, and, when coupled with any of these, or even with unfairness, such as great inadequacy of consideration, may make a contract voidable, when neither such weakness nor any of these other things alone, or of themselves, would do so." 8 Sup. Elliott on Contracts, § 365; *Hightower* v. *Nuber,* 26 Ark. 611; see *West* v. *Whittle,* 84 Ark. 490, and cases there cited; also *Travers*

v. *Jones,* 116 Ark. 95; *Martin* v. *Davis,* 105 Ark. 44; *Boggianna* v. *Anderson,* 78 Ark. 420. In *Boggianna* v. *Anderson, supra,* following *McCulloch* v. *Campbell,* we held that "to avoid a deed for undue influence it is not sufficient that the grantor was influenced by the grantee in the ordinary affairs of life, or that he was in close touch and upon confidential terms with him, but there must be a malign influence resulting from fear, coercion, or other cause, which deprives the grantor of his free agency in disposing of his property." See also *Milton* v. *Jeffers,* 154 Ark. 516; *Taylor* v. *McClintock, supra,* at page 280.

The capacity on the part of Garrison to make the deeds under review is presumed. The burden of proof therefore was on the appellee to establish the allegations of his complaint. *Taylor* v. *McClintock, supra.*

Applying the above principles of law to the facts as above set forth, we have reached the conclusion that the trial court erred in finding that Garrison did not have sufficient mental capacity to make the deeds. As we read the record, the testimony of those who had business transactions with him before, at the time of, and after the execution of the deeds, and who had the best opportunity to observe him, such as merchants and others with whom he had dealings, as well as those who observed his conduct in the ordinary life of the community, shows that he had mental capacity sufficient to enable him to make the deeds in controversy. The testimony of the experts who had made a personal examination of Garrison with a view of determining whether or not he had sufficient mental capacity in 1901 to make the deeds, is entitled to great consideration, and likewise the fact that Garrison, while giving his testimony, was under the observation of the learned trial court. The chancellor, in all probability, was greatly influenced by the testimony of the experts and such personal observation of Garrison. But these experts, except one, had not been acquainted with Garrison until long after the deeds were executed, and the one expert who had observed him before that

time had made no examination with a view of ascertaining his mental condition. He had only casual and general observation of him as a citizen of the community. The personal examination by the experts to ascertain his mental capacity was made after his mind and body had been weakened by disease as well as the infirmities of old age. It occurs to us that the opinion of experts as to the mental capacity of Garrison, grounded upon an examination made of him some twenty years after the deeds were executed and after accident, disease, and advancing years had made inroads upon his mind and body, and the condition of his mind and body as he appeared to the chancellor at the time of his examination, should not overbalance the testimony of many witnesses as to his mental condition at the time of the execution of the deed, as determined by business transactions and civil conduct some time before and after the deeds were executed, and before any accident had befallen him, and before old age and disease had laid their hands upon him. Before this occurred it appears, from a preponderance of the evidence, that he was mentally able to carry on the ordinary business affairs of a small farmer. He bought and sold, and was able to conduct his business satisfactorily and profitably. He was twice married to women who were themselves shown to be intelligent and capable. He served on juries, voted at elections, took a keen interest in politics, church, and secret orders, and discharged functions in connection with these that he would hardly have been called upon or expected to perform if his mental processes had been such as to render him incapable of understanding the nature and extent of the simple transaction of making deeds to seventy-five acres of land.

As we view the record, a decided preponderance of the evidence shows that the appellants did not perpetrate any fraud or exercise any undue influence upon Garrison to cause him to execute the deeds.

The deeds which the appellee seeks to set aside are of long standing. Nearly twenty years elapsed after

their execution and before any steps were taken to have them annulled. The lands have greatly enhanced in value. Appellants have complied with the terms of the deeds by paying the consideration named therein, and during all this time have managed and controlled the property as their own, and have made valuable improvements thereon. Under all the facts of the record we are convinced that the appellee has not, by a preponderance of the evidence, sustained the allegations of his complaint as to the lack of mental capacity, and fraud and undue influence. The court therefore erred in entering a decree canceling these deeds.

The court likewise erred in rendering a decree in favor of the appellee against the appellants for the sum of $700. A preponderance of the testimony shows that the $700 in the hands of the appellants was the separate property of their mother, and that she delivered the same to them before her death, with the understanding that it was to be their property, but upon her death they agreed that they would look after Garrison and would use any of it for him that he might need, which they had always been ready and willing to do. The appellee has not shown by a preponderance of the evidence that the money for which this decree was rendered had at any time become the separate property of Garrison. The testimony of the appellants is to the contrary, and we do not find any evidence in the record sufficient to overcome their testimony.

For the errors indicated, the decree of the court is reversed and the cause remanded, with directions to dismiss the appellee's complaint for want of equity.