## ATWOOD v. BALLARD.

### Opinion delivered November 23, 1926.

1.  DEEDS—MENTAL CAPACITY.—If the maker of a deed has sufficient mental capacity to retain in his memory without prompting the extent and condition of his property and to comprehend how he is disposing of it and to whom and upon what consideration, he possesses sufficient mental capacity to execute the deed.

2.  DEEDS—MENTAL CAPACITY—BURDEN OF PROOF.—Since the sanity and mental capacity of a grantor to make a deed is presumed, the burden is upon those who allege that he did not have sufficient mental capacity to make the deed.

3.  DEEDS—FINDING OF MENTAL CAPACITY.—A finding that a grantor had sufficient mental capacity to make a deed held not against the preponderance of the evidence.

Appeal from Cleveland Chancery Court; *H. R. Lucas,* Chancellor; affirmed.

*Toney & Smith,* and *Owens & Ehrman,* for appellant.

*R. W. Wilson,* for appellee.

WOOD, J. This action was originally instituted by C. B. Atwood, guardian of Noble Atwood, against Ollie Ballard, Rosa Hardnett, Edward Atwood and Willie Atwood, hereafter called appellees. After the action was commenced, Noble Atwood died, and the cause was revived in the name of C. B. Atwood as administrator, and also in the name of the legal heirs of Noble Atwood, hereafter called appellants. It was alleged in the complaint that Noble Atwood was the owner of six hundred acres of land in Cleveland County, Arkansas, which lands are described in the complaint; that on July 25, 1923, he executed and delivered to the appellees a deed to the lands; that on that day, and long prior thereto, Noble Atwood was a person of unsound mind and incapable of executing a valid contract; that the deed was executed without consideration and was void; that the appellees were claiming to be the owners of the land and seeking to oust Noble Atwood from the possession thereof, and that the deed constituted a cloud upon the title of the appellants and the other heirs of Noble Atwood. The

prayer was that the deed be canceled and that the title of the appellants be quieted.

The appellees, in their answer, admitted that Noble Atwood was the owner of the lands in controversy and that he executed the deed thereto as alleged, but denied that he was insane before and at the time the deed was executed, and also denied that the deed was without consideration, and void.

John Sandine testified that he had known Noble Atwood for thirty years, and had had occasion to observe his conduct for the last three years past. He was not of sound mind in July, 1922; he acted curious like—he didn't have good sense—had been getting worse, and was now in the insane asylum. Atwood lived on his old home place in 1922 with colored people, who took care of him after he had a spell of sickness. It was after this spell that he became mentally unsound, and deeded the property to the appellees.

J. W. Greenlees testified that he is a justice of the peace; that he had known Noble Atwood for forty years, and had been immediately associated with him for the last ten years. Atwood is now in the asylum at Little Rock. Witness had an opportunity to observe Atwood's conduct during the years 1922 and 1923 and 1924. From his actions and conduct witness thought he was mentally unsound, and witness did not think he was capable of managing his business affairs in July, 1923.

H. O. Wilson testified that he was a practicing physician, and had been in the county of Cleveland for fifteen years. He was acquainted with Noble Atwood. He attended him as a physician in January, 1923. Since that time Noble Atwood's mental condition had been bad. Witness did not think that Noble Atwood was capable of managing his business affairs in July, 1923. Witness did not think Atwood was capable of making a deed and of knowing the effect of it. Witness was positive that Atwood did not know what he was doing during the month of July, 1923. Witness based his opinion upon his observations of Atwood's actions and conduct.

I. E. Moore testified that he had been sheriff of Cleveland County for six years, and also he had been a merchant in the county. As sheriff and merchant he had come in contact with Noble Atwood and had had an opportunity to observe his conduct during the last few years. From such observation he regarded Atwood as unbalanced during the years 1923 and 1924, and did not consider that he was capable of transacting and managing his business affairs. Witness considered Atwood totally incapable of looking after and managing his business from the first part of the year 1923.

H. D. Sadler testified that he was a practicing physician, and had lived and practiced medicine in Cleveland County for twenty-nine years. He had known Noble Atwood forty years. He was called as a physician to treat Atwood in the early part of 1923. After this illness witness did not see him, except when he would come to town. From observing him on the streets of Rison in 1923 and treating him as a physician, witness thought he was mentally unbalanced. There was a trial of some kind as to Atwood's mental condition, and witness testified at that time that Atwood was mentally unbalanced. Witness had never examined or treated Atwood except in his relation as physician and surgeon. Atwood was now in the asylum.

J. B. Searcy testified that he had business dealings with Atwood in 1920, and had observed him occasionally during 1923 and 1924, and he did not consider him capable of managing and controlling his own affairs.

Leali Atwood testified that he was a nephew of Noble Atwood; that his uncle had a spell of sickness in 1923, and at that time acted like a crazy man. He did not manage his farm in 1923, because he was mentally and physically incapable of doing so. After this illness in January, 1923, he would stand off by himself and have nothing to say to anybody, and acted so unnaturally that witness did not consider him mentally capable of managing his own affairs.

Another nephew of Noble Atwood testified that, after his uncle's illness in 1923, he was in very bad shape, and had very little to say.

Three witnesses testified to the effect that, during 1923 and 1924, a negro woman by the name of Eula Bonds, whose reputation for morality was not good, and other negro women, went to the house of Noble Atwood; that Atwood would send money to these women; that he gave Eula Bonds at one time as high as $50; that he would give orders on his merchants for the best grade of silk and shoes to these negroes. Before 1923 he had paid his bills and was conservative in his expenditures, but after that he was reckless in giving these orders, and merchants finally had to turn them down because they had become too large and Atwood had failed to pay his bills. One of the witnesses stated that one day Atwood told the witness that if the bank were on fire he could put it out with magic. This witness considered him mentally deranged for two years before his death.

H. G. Atwood, who was the assistant cashier of the Bank of New Edinburgh, testified that Noble Atwood carried an account with that bank, and that, prior to 1922, he was conservative with his funds. After that witness had to turn down a number of checks, which totaled several hundred dollars, on account of insufficient funds.

The above is substantially the testimony adduced on behalf of the appellants. George Brown testified, on behalf of the appellees, that he was an attorney at law; that he had been justice of the peace, deputy prosecuting attorney, Representative, and State Senator. He had known Noble Atwood for seventeen years. During the last half of that time he was well acquainted with him. He had been employed by Noble Atwood's half-breed children to defend them in a suit that had been filed against them. This action was previous to the present litigation. In order to prepare his defense, witness consulted with Noble Atwood. That was in February, 1924. Atwood told witness that he had an agreement with the appellees to deed them the land if they would support

and furnish him a home and medicine as long as he lived. Witness had several conversations with Atwood. Witness refused to accept employment until he had talked with Noble Atwood and ascertained whether or not he was sane. Witness talked with Atwood for an hour and a half with reference to the deed that he had made to the appellees. Witness discussed the action that had been brought against the appellees, and informed him that the plaintiffs in that action were seeking to set aside the deed because it was claimed he was insane when he executed it, and witness informed Atwood of the different grounds that had been urged as proof of his insanity. One was that he had issued a number of bad checks, and that was unusual for him. Another was that he had divested himself of almost all of his property, not retaining enough to support himself and pay his debts; and another, that he had deeded away his ancestral home to a gang of negroes. To this Atwood replied as follows: So far as the checks were concerned, he had Liberty bonds to the amount of $1,000 in the Bank of New Edinburgh. He was also a stockholder in the Bank of New Edinburgh. He had expected that the bank would pay the checks and treat them as liens on his Liberty bonds, and that they would also take his bank stock as security, as had been done before. Atwood said, "As to deeding away everything I have without retaining enough to support me and pay my debts, I had an agreement with Ball Atwood (one of the defendants in this suit) and the other children that we would all join in a deed and sell the timber and pay all my debts. Besides that, I have retained enough property in bank stock and Liberty bonds and real estate to support me as long as I am likely to live." He also said, "Besides all that, they agreed that, if I would deed them this land, they would support me and furnish me a home and medicine as long as I lived. As to the old home of my fathers being deeded away, I inherited one share of that and the other shares I bought from my brother and my sister." After that, witness had several conversations with Noble Atwood,

and, on one occasion, went with him to Pine Bluff and heard him make the same statements as above, and, in addition, on that occasion he heard Atwood say that he had inherited one share of the old home place from his father and had bought one share from his brother and sister, and he did not see why his children might not as well have the land from him as for him to have had it from his father. When he spoke of his children he had reference to his half-breed children by his negro paramour. Witness saw no difference in his condition in later years from that of former years, except that he had gown older and a little more feeble physically. Witness discovered no change in his mental condition, and stated that he had a clear conception of what property he had and what he intended to do with it and how to attend to it. In witness' opinion, Atwood had a clear conception of the effect of the deed. Witness was employed by the appellees to defend the action brought by the guardian and to set aside this same deed. The present attorney for the appellees later became associated with witness in the defense of that suit. Witness is in no way interested in the present case. When the present action was filed, the appellees sought to employ witness, but they could not agree on a fee, and witness was not employed. Noble Atwood had lived mostly among negroes until he apparently cared very little for white society.

Two merchants, Edgar McKinney and J. L. Reed, testified that they were in the mercantile business at Rison and did business with Noble Atwood during the year 1923. One of these witnesses testified that, during the first half of 1923, he did two or three hundred dollars' worth of business with Atwood. The goods were sold on his order, and these witnesses had filed a claim against Atwood's estate for indebtedness incurred by him during the year 1923. One of these witnesses stated that the orders were given to negroes. Atwood had always paid his accounts prior to the last one and witness had considered him financially good until he received

these bad checks. The other witness testified that he considered Atwood capable of transacting business; that, during the later years of Atwood's life, witness handled more of his checks than he ever had before, and the estate was indebted to witness in the amount of checks payment of which had been refused because of insufficient funds.

P. H. Harris testified that he operated a sawmill, and lived near Noble Atwood during the years 1923 and 1924. Witness saw him four or five times in 1923, and went over timber lands with him. Witness discussed with him farming and timber business, and was with him on one occasion three hours, looking over some timber. Atwood was showing witness some of the lines, and he pointed out to witness the corners of the land by the usual designations. Atwood showed witness between eight and twelve corners. They went six or seven miles all around the tract of land. Atwood had a good idea of what his timber was worth. He stated that he knew it was high, and he was not going to give it away. Some five or six weeks after this occasion witness entered into a conditional deal with Atwood for the sale of his timber. Witness wanted three years to cut the timber, and Atwood stated that he could give witness but two years. Finally the deal was not consummated. From witness' conversations with Atwood, at various times and places, witness was of the opinion that Atwood was capable of transacting business and managing his own affairs. "If," says the witness, "there was anybody in Rison that talked with good judgment, Atwood did." Another witness talked with him during the early part of 1923 in regard to the extension of oil leases which Atwood had previously signed. Atwood signed a contract of extension. He read the same over, and they talked about it. Atwood said it was "good for all of us getting a well drilled." He seemed to witness as much interested in that, after he read the contract and found out what they were after, and talked about it as much, as any man witness met on his rounds. Atwood thought it was a good thing, and talked with business

sense about it.   Witness did not observe any difference in Atwood's conduct during that year from what it had been in former years.   He had known Atwood some thirty-five years.

James F. Crump testified that he was a physician and surgeon, located at Pine Bluff.   Prior to moving to Pine Bluff he had practiced medicine in Cleveland County, Arkansas.   He had known Noble Atwood about forty years.   Witness had not read any works especially on mental diseases, but had had lectures thereon.   He had very little experience in the treatment of mental diseases. His practice had been that of the average practitioner. When witness lived at Rison he would see Atwood possibly once a month.   During the spring and summer of 1924, witness saw Atwood in witness' office in Pine Bluff. Atwood stayed in witness' office on that occasion perhaps an hour, and witness examined him as to his mental condition, at the request of Mr. George Brown, attorney, at Rison (a brother-in-law of witness).   Brown brought Atwood to witness' office, and asked witness to examine him and determine, if possible, his mental condition, stating that a guardian had been appointed for Atwood, and Brown desired to ascertain whether Atwood was capable of making a deed to his property which they were seeking to have set aside.   Witness asked Atwood why he had deeded his estate to his illegitimate children, and Atwood stated that he did so because they had promised to take care of him in his old age, and he was getting physically unable to farm and make a living.   Witness asked him if there was any parental feeling on his part towards them that induced him to make the deed, and whether or not he would have made the deed to any person who was not kin to him, under the same circumstances, and Atwood replied that he would not.   Witness asked him in regard to some checks that he had overdrawn at the Bank of New Edinburgh, why he had issued these checks if he knew that the money was not in the bank, and he replied, "I didn't know how much money I had in there, but I did know that I had a Liberty bond

on deposit with them, that would have been sufficient to cover the checks I issued, if I didn't have sufficient money." In the course of the conversation witness asked about several other things, and Atwood's answers were such as to convince witness that Atwood knew what he was doing, and that his mental condition was perfectly sound. Witness did not observe any special difference on this occasion in Atwood's mental condition from what it had always been. In witness' opinion, Atwood knew and appreciated the effect of the transaction whereby, as grantor, he had conveyed to Ed Atwood and his other illegitimate children the tract of land in controversy, and was mentally capable of managing his business affairs in a reasonable and prudent manner. It is easier for one who is examining another for mental unsoundness to detect signs of insanity than it is when one is not looking for them. Witness had not seen Atwood, before the day he had examined him with special reference to insanity, for about ten years. In making the examination, witness observed the expression of his eyes, manner of talking, and his conduct generally, from every angle necessary to determine whether or not he was mentally unsound.

E. R. Mattox testified that he was a merchant and notary public, and was working for the Wonder State Oil Company most of the year 1923, and he prepared the deed in controversy. He took the acknowledgment. Noble Atwood gave him the tax receipts or deeds to get the description from. Atwood told witness that he had some lots in town that he didn't want to put in the deed. Witness was working for the oil company at the time the deed was executed, and visited Atwood for the purpose of getting an extension on an oil lease. Witness had taken Atwood's acknowledgment before to a lease executed to the Wonder State Oil Company. On the same day that Atwood executed and acknowledged the deed, he executed an extension of an oil lease to the Wonder State Oil Company. This was all done a few days before the first of August, 1923. Witness had known Noble

Atwood about eighteen years, and he noticed no difference in his conduct and conversation on the day that he executed the deed and extension of the oil lease as compared with his conduct in former years. Only he was physically a little more feeble because he was older. Noble Atwood read over the oil lease carefully, and went over different phases of it just like any one else would have done, only he was a little slower in his conversation than he had been. From his conduct and conversation in these transactions, witness was of the opinion that Atwood knew and appreciated the nature of the transaction when he executed the deed to these four parties.

J. M. Elrod testified that he was vice president and cashier of the Bank of Rison, and that Noble Atwood carried an account with the bank during the year 1923 and during previous years. He set forth many business transactions between Atwood and different merchants and individuals, all of which went through the Bank of Rison, which were paid, subsequent to July 25, 1923. As late as October 9, 1923, Atwood deposited with the Bank of Rison $10.61.

The testimony of J. E. Lybrand and Frank Poteet was to the effect that they had business transactions with Noble Atwood—one in October, 1923, in regard to buying some timber, and the other in December, 1923, and both these witnesses gave the substance of these negotiations with circumstantial detail, and, in their opinion, there was nothing in the conversation and conduct of Atwood to indicate that he was of unsound mind and incapable of transacting his business and managing his own affairs.

The mother of the appellees, a negress, testified that Noble Atwood was their father. She had lived in the house with Atwood nearly forty years. His attitude toward the appellees, his children, while they were growing up, was that of a father. He provided for them and looked after them in general.

We deem it unnecessary to set out the testimony of the appellees. Suffice it to say, their testimony was to

the effect that the relation between them and Noble Atwood was that of father and children. Their testimony details circumstances and facts which tended to prove that Atwood, before and at the time of the making of the deed in controversy, was of sound mind; that the consideration for the deed was that they were his children, and that they should take care of him until he died. The deed was filed for record on January 30, 1924.

The trial court found that "Noble Atwood was sane and fully capable of transacting business, and that, as to this particular transaction, he fully understood the contents and effect of said instrument; and that said deed of conveyance was supported by a good and valuable consideration, and is valid and binding as between the plaintiffs and the defendants herein, and vests title to said lands as against these plaintiffs, as the collateral heirs of Noble Atwood." The court thereupon rendered a decree dismissing the complaint for want of equity and vesting and quieting title to the lands in the appellees, from which decree is this appeal.

"The familiar principles of law applicable to cases of this kind have often been announced by this court. If the maker of a deed, will, or other instrument, has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what consideration, then he possesses sufficient mental capacity to execute such instrument. Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting his own interest in dealing with another is all the law requires. If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him." *Pledger* v. *Birkhead,* 156 Ark. 443, 455, 246 S. W. 510, and cases there cited. See also *Beaty* v. *Swift,* 123 Ark. 166, 184 S. W. 442.

It will be observed that the only issue presented in the case is whether or not Noble Atwood had sufficient mental capacity to execute the deed in controversy. This was purely an issue of fact. Since the sanity and mental capacity of Noble Atwood to make the deed in controversy is presumed, the burden was upon the appellants to prove that he did not have sufficient mental capacity to make the deed. We have fully set forth the material testimony adduced by the appellants and the appellees upon this issue. It speaks for itself. It could serve no useful purpose to discuss it in detail. Applying the principles of law announced in *Pledger* v. *Birkhead, supra,* to the facts of this record which the testimony tends to prove, we are convinced that Noble Atwood, at the time he made the deed, had sufficient mental capacity to make the same, and the trial court ruled correctly in so holding. We are brought to this conclusion, not so much because of the greater number of witnesses who testified in behalf of the appellees that Noble Atwood did have sufficient mental capacity to make the deed in controversy, but because of the character of the testimony of these witnesses. It occurs to us that the testimony of the witnesses on behalf of the appellees is entitled to greater weight than the testimony of the witnesses on behalf of the appellant, for the reason that the testimony of many of the witnesses for the appellees shows that they had a better opportunity to know Atwood and to observe and understand his mental status than did the witnesses for the appellants. For instance, we are greatly impressed with the testimony of witness Brown and of Dr. Crump, who made a special examination of Atwood with a view of ascertaining whether he was of sound mind. While these witnesses were not experts on insanity, they did make a special examination of Atwood in the way of questioning him concerning the making of the deed in controversy, his motives for so doing, and his relationship and attitude toward the appellees. The testimony of these witnesses showed that they were entirely disinterested, and their professional

character and high standing, in the absence of any showing to the contrary, we believe entitles them to full faith and credit. Since they made a special examination of Noble Atwood to determine his mental capacity, their testimony is entitled to greater. weight than the testimony of the physicians and other witnesses for the appellants, who did not make a particular examination of Atwood for the purpose of determining the precise issue as to whether or not he was mentally capable of making the deed in controversy. Likewise, the testimony of the notary public who wrote the deed and took the acknowledgment, of the vice president and cashier of the Bank of Rison, and of several other witnesses who had business transactions with Atwood, in which it became necessary for them to go over with him various matters of detail, is entitled to more weight than the testimony of witnesses who merely observed Atwood's conduct and had casual and occasional conversations with him. After giving careful consideration to the testimony of all the witnesses and making all due allowance for any bias or prejudice that might exist on account of relationship and interest, and all other matters brought in review by this record, we are thoroughly satisfied that the finding of the trial court, to say the least, is not clearly against a preponderance of the testimony. On the contrary, the court's finding of fact is in perfect accord with our own conclusion; and this finding, we believe, is supported by a decided preponderance of the evidence.

It is a well settled rule of this court not to disturb the findings of the chancellor unless the same are clearly against the preponderance of the evidence. *Jordan* v. *Bank of Morrilton,* 168 Ark. 117, 269 S. W. 53; *Leach* v. *Smith,* 130 Ark. 465, 470, 197 S. W. 1160, and cases there cited.

The decree is in all things correct, and it is therefore affirmed.