Hunt *v.* Jones.

5-1390                                    309 S. W. 2d 22

Opinion delivered January 20, 1958.

*Parker Parker* and *Caviness & George,* for appellant.

*John B. Thurman* and *Robert J. White,* for appellee.

MINOR W. MILLWEE, Associate Justice. This is a suit by eleven of the seventeen cousins and collateral heirs of Miss Jessie McCray, deceased, to set aside two deeds which she executed to appellees, Garrett Jones and Evelyn Jones, his wife, on the grounds of mental incompetency and lack of consideration. The first deed to 100 acres of Arkansas River bottom land was executed on May 5, 1953, and the second deed to a small store building in Dardanelle, Arkansas, was executed February 25, 1954. A rather belated amendment to the complaint also charged that Miss McCray was induced to execute the deeds through the fraud, trickery and undue influence of appellees and others who were not made parties to the suit. Appellees answered with a general denial and, in addition, pleaded estoppel and *res judicata* by reason of appellants' election to maintain and settle a separate suit against persons other than appellees for misappropriation of the $15,000 purchase price of the 100-acre tract.

Appellee, Garrett Jones, died testate prior to the trial and the cause was revived in the name of his widow as executrix. After an extensive hearing covering 700

pages of testimony and exhibits the chancellor on exchange found the issues in favor of appellees; that Miss McCray possessed the requisite mental capacity to execute the two deeds in question; and that each of said instruments was supported by valuable and adequate consideration. The principal issue here is whether these findings are against a preponderance of the evidence.

Miss Jessie McCray was 86 years of age at the time of her death on August 17, 1954. She was reared at Dardanelle, Arkansas, where she spent most of a very active and useful life as a registered nurse but also traveled extensively in this and other countries with wealthy patients. She was a tall, stately and attractive woman with strong feelings and pronounced likes and dislikes. Her family consisted of her father, mother and two brothers who predeceased her. She was the sole surviving heir of her brother, A. S. McCray who died in June, 1952. Prior to his death Miss McCray owned her home and other real property besides the two parcels of land involved herein which she inherited from him. She had previously owned the 100-acre tract as a gift from her mother but had deeded it to A. S. McCray in 1947. Miss McCray and Attorney Herbert C. Scott were appointed co-administrators of the A. S. McCray estate. Upon conclusion of the administration the remainder of the estate was delivered to her in February, 1953. She had offered the 100 acres for sale to various persons receiving offers ranging from $7,500 to $11,000 prior to May 5, 1953, when she concluded the sale to appellees and executed the first deed for a consideration of $15,000 which was demanded and paid in cash. Then she sold and conveyed the store building to appellees for $500.

The testimony as to Miss McCray's mental capacity to execute the deeds in question is in sharp dispute. We first consider briefly the medical evidence. Drs. Brooks Teeter, W. P. Scarlett and Elizabeth Fletcher testified on behalf of the appellants. Dr. Teeter first saw and treated Miss McCray on May 29, 1954, when she was admitted to a hospital at Russellville at her own request. During the first three days of her hospitalization and at intervals thereafter until her death her mind was clear but at

other times she was noisy, belligerent and mentally confused. She then had arthritis and arteriosclerosis and he noticed nothing to indicate that she was mentally incompetent when she entered the hospital and he could not say what her mental condition was when she executed the two deeds.

Dr. Scarlett was reared in Russellville and his wife grew up in Dardanelle and is a half sister to one of the heirs. They were friends of the McCray family and would visit Miss McCray and others in Dardanelle and Russellville two or three times a year. Dr. Scarlett noticed a marked mental change in Miss McCray beginning about 1946 when she would ramble in her conversation and make what he regarded as irrational statements about her foreign trips and some candlesticks she had brought back from England. Particularly after 1952 he noticed that her clothes were dirty and that she had become a disorderly housekeeper. He thought she wanted to give everything she owned away and said she did give all her valuable antiques away but would not give any of them to Mrs. Scarlett. There was other evidence that she sold the antiques. He believed she was definitely off mentally when she told them she was giving some of her money to Mayo Clinic and Tulane University. He diagnosed her condition as senile dementia and stated she was mentally unfit to handle her brother's estate in 1952, and told one of the heirs about a year later, "they were silly not to put her down in Little Rock where she belonged."

Dr. Fletcher is a psychiatrist and saw Miss McCray only once in the hospital 10 days prior to her death. Miss McCray was then under narcotics, about to die and incapable of revealing any case history. After talking with Dr. Scatlett, Mrs. Bessie Hunt and others, and after listening to appellants' witnesses testify, Dr. Fletcher concluded that Miss McCray's personality changed and she became "paranoid" and "psychotic" about 1945. As to her mental competency on May 5, 1953 and February 25, 1954, Dr. Fletcher gave a "yes and no" answer stating that Miss McCray perhaps then knew the extent, nature and value of her property but the fact that she

might then have been acting under the influence of some unidentified person still rendered her incompetent. While she felt that Miss McCray doubtless had arteriosclerosis at the time she executed the deeds she could not say that she was then suffering from it in such a degree as to render her incompetent. She also stated that Miss McCray's mental condition could vary from week to week. If she had heard appellees' witnesses testify that might have altered her opinion as to Miss McCray's mental competency at the time she executed the deeds.

Dr. Frank Gavlas, called by appellees, was Miss McCray's personal physician and treated her on occasions from November 28, 1945 until she went to the hospital in Russellville in May, 1954. While Dr. Gavlas was a general practitioner and reluctant to testify concerning Miss McCray's mental competency, he never detected any signs of paranomia or any evidence of any other mental disability in Miss McCray prior to May, 1954, when she told him she was not in position to remain at her home and asked that she be taken to a hospital. The fact that she was rational enough to appreciate her condition and realize that she needed additional treatment was some indication to the doctor of her sound intellect. He was a witness to her will in August, 1952, and in all his associations with her he never observed any symptoms indicating mental incompetency.

It would serve no useful purpose and unduly extend this opinion to attempt to detail the testimony of the 40 lay witnesses. Some of the appellants and several neighbors of Miss McCray thought she was incompetent because in the last few years of her life her memory was bad, she was not as friendly, orderly and neat as formerly, used beer and gin whereas she had formerly been a prohibitionist, or seemed to prefer the association and confidence of a few friends who were unrelated to her to the exclusion of a few of the appellants and others with whom she had formerly been more closely associated. There was evidence that she was curious about those who visited her neighbors, would admit visitors only through the rear of her home and enforced a time

limit on the visits of a minister. One of the appellants and another neighbor, who had formerly been close associates stated she ordered them out of her home but the former conceded that her cousin knew the value and extent of her property during 1953 and part of 1954.

Appellees produced several business and professional people including a merchant, a druggist, a lawyer, a real estate agent and bank officials who testified concerning their dealings with Miss McCray and to other facts indicating that she had sufficient mental capacity to execute the deeds in question. In the numerous transactions she had with them before and after execution of the deeds they considered her to be thoroughly competent. The notary and others present at the time of the execution of the two deeds observed no indication of mental incompetence on her part.

Appellants failed to establish their contention either that the consideration for the two deeds was inadequate or that Miss McCray actually did not receive it. The evidence is overwhelming to the effect that $15,000 was more than a fair price for the 100-acre tract and those present when the deed was executed stated that it was paid to Miss McCray in cash just as she had demanded. While more than $500 might have been obtained for the store building, it was in a bad state of repair, renting for only $15.00 per month, and the price paid cannot be said to be shockingly inadequate.

Since the sanity and mental capacity of Miss McCray to make the deeds in question is presumed, the burden rested on the appellants to show her mental incapacity to execute them by a preponderance of the evidence. *Gibson* v. *Gibson,* 156 Ark. 528, 246 S. W. 845. As this court said in *Pledger* v. *Birkhead,* 156 Ark. 443, 246 S. W. 510: "The familiar principles of law applicable to cases of this kind have often been announced by this court. If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what considera-

tion, then he possesses sufficient mental capacity to execute such instrument. Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting his own interest in dealing with another is all the law requires. If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him. *McCulloch* v. *Campbell,* 49 Ark. 367; *Seawell* v. *Durst,* 70 Ark. 166; *Taylor* v. *McClintock,* 87 Ark. 243-247; *McIlroy* v. *Tucker,* 115 Ark. 430.''

Justice HART, speaking for the court, in *Bilyeu* v. *Wood,* 169 Ark. 1181, 278 S. W. 48, stated the rule this way: ''To invalidate a deed on the ground of the grantor's mental incapacity, the proof must show that the grantor was incapacitated from intelligently comprehending and acting upon the affair out of which the transaction grew, and that he did not intelligently understand and comprehend the nature and consequences of his act. In other words, the mental capacity at the time of signing a deed sufficient to comprehend the nature of the transaction is the standard fixed by the law for determining the mental competency of the person signing the deed.'' See also, *Atwood* v. *Ballard,* 172 Ark. 176, 287 S. W. 1001; *Sharp* v. *Oates,* 178 Ark. 983, 13 S. W. 2d 15; *Culling* v. *Webb,* 208 Ark. 631, 187 S. W. 2d 173; *Petree* v. *Petree,* 211 Ark. 654, 201 S. W. 2d 1009.

While we must view this highly conflicting and sharply disputed evidence from the printed page, the chancellor had the advantage of observing most of the witnesses as they testified. After carefully considering all the testimony of these witnesses and the probable bias or prejudice that might exist on account of the relationship or interest of some of them, along with all other matters brought into this record, we cannot say the chancellor decided the issues against the preponderance of the evidence. This conclusion renders it unnecessary to determine whether appellants were estopped to maintain the instant suit by reason of having previ-

ously elected to maintain and make a substantial settlement of a separate suit against others for the $15,000 purchase price of the 100-acre tract. We have also carefully considered appellants' objections to the admission of certain evidence and find no error in that respect. The decree is accordingly affirmed.