[Civ. No. 16507. First Dist., Div. One. Jan. 29, 1957.]

JOSEPH FLEISHMAN, Respondent, v. DAVID BLECH-
MAN et al., Defendants and Appellants; RACHEL
FLEISHMAN, Intervener and Appellant.

Hyman & Hyman for Defendants and Appellants.

Delany, Fishgold, Freitas & Rowe and Matthew M. Fishgold for Intervener and Appellant.

Wolff & Wolff, Harry K. Wolff, Jr., and Harry K. Wolff, Sr., for Respondent.

AGEE, J. pro tem.*—This litigation was commenced on June 29, 1950, by the filing of a complaint by Joseph Fleishman against David Blechman and Frances Blechman, his wife, to quiet title to certain real property on the southeast corner of Irving Street and 8th Avenue, in the city and county of San Francisco. David and Frances answered that they were the outright owners of a one-fifth interest and held the remaining four-fifths interest under an oral trust for the benefit of Joseph and his wife, Rachel. Rachel filed a complaint in intervention alleging a beneficial interest in the property and naming Joseph, David and Frances as defendants therein. Joseph died before the trial and his representatives were substituted for him. Judgment was rendered

---

*Assigned by Chairman of Judicial Council.

on December 3, 1953, decreeing that David and Frances were the owners of a one-fifth interest in the property and the rents therefrom and that they held the remaining four-fifths interest and the rents therefrom in trust for Joseph's representatives. Each interest was charged with its proportionate share of any necessary disbursements made for the maintenance and preservation of the property. David and Frances were ordered to execute a deed of said four-fifths interest to Joseph's representatives and account to them for said rents and disbursements since June, 1950. Rachel was denied any interest in the property. The respective motions of Rachel, David and Frances for a new trial were denied.

David and Frances have appealed from all of the judgment, except the portion establishing their one-fifth interest, and from the order denying their new trial motion. Such order being nonappealable, the purported appeal therefrom is dismissed. Rachel has appealed from the entire judgment and from the order denying her new trial motion. The purported appeal from such order is likewise dismissed, for the same reason just stated. Rachel died during the pendency of this appeal and her representative has been substituted herein. For the purpose of simplicity, the original parties and their representatives are referred to herein as Joseph, Rachel, David and Frances, respectively.

Joseph and Rachel were married on February 27, 1943. They were then over 70 and 60 years of age, respectively. Each had children by previous marriages. Two of Joseph's children are his representatives herein and Frances is Rachel's daughter and administratrix. Joseph's main source of income was the rent received from properties on Pierce Street and on Divisadero Street, in San Francisco. He had a life estate in these properties, having deeded the remainder to his children.

The property which is the subject of this litigation was acquired by deed, dated April 23, 1947, and recorded May 5, 1947. It conveys the record title to David and Frances, as joint tenants. Although Joseph, in his complaint, alleged ownership of the entirety, he admitted in his answer to Rachel's complaint in intervention that David and Frances owned an undivided one-fifth interest and such interest is not in dispute. The dispute is over the remaining four-fifths, which David and Frances have always acknowledged was acquired by them as trustees for Joseph and Rachel.

The trial court made findings that Joseph had orally agreed

with David and Frances that he would contribute four-fifths and they would contribute one-fifth of the purchase money; that they would take title to the property in their own names but "were to hold and administer the said four-fifths (4/5ths) undivided interest therein of said Joseph Fleishman for the benefit of said Joseph Fleishman and the plaintiff in intervention, Rachel Fleishman, his wife, until such time as Joseph Fleishman became disabled or died, and thereupon for the sole benefit of said Rachel Fleishman"; that the moneys used by Joseph to make the purchase were his separate funds and that Rachel had no interest in the property; that Joseph never became disabled; that the trust was revocable; that in June, 1950, Joseph repudiated and revoked the trust agreement and demanded of David and Frances that they convey the trust property to him; that they refused to do so.

■ The finding that the trust was revocable is correct, since there was no agreement that it was to be irrevocable. (Civ. Code, § 2280.*)

The trial court concluded that David and Frances are holding said four-fifths interest in trust for the benefit of Joseph alone and that Rachel owns no interest therein.

### The Legal Position of David and Frances

David and Frances have never attempted to raise the defense of the Statute of Frauds and it is not an issue herein. Their answer acknowledges the trust and sets up the oral agreement as to their duties as trustees in the following language: "That in the event of disability of Joseph Fleishman, or in the event of his death, the entire four-fifths interest and the income thereupon, should become the property of the said Rachel Fleishman. That so long as Joseph Fleishman was alive and in good health, the net income on the four-fifths interest should be paid to said Joseph Fleishman and said Rachel Fleishman." This is in complete accord with the findings quoted above. ■ The trial court did not find or *impose* a constructive or resulting trust, which is a remedial device created to prevent unjust enrichment. There was no necessity to do so. It found an express trust created by an oral agreement, voluntarily accepted by the trustees. (Civ. Code, § 2216.) ■ There was no finding of repudiation or bad faith by the trustees and they are entitled to the

---

*The first sentence of this section provides as follows: "Unless expressly made irrevocable by the instrument creating the trust, every voluntary trust shall be revocable by the trustor by writing filed with the trustee."

presumption that they acted in good faith. (*Estate of Canfield,* 80 Cal.App.2d 443, 451 [181 P.2d 732].)

David collected the rents, made the loan payments and other necessary disbursements on the property, and, until June, 1950, paid over to Joseph four-fifths of the remainder. In June, 1950, however, he paid over said four-fifths, amounting to $216, to Rachel. David testified that his reason for transferring the payments from Joseph to Rachel was that Joseph had become disabled and that, under the terms of the trust, he, as trustee, was obligated to do so. The trial court found, however, as follows: "That as of June, 1950, said Joseph Fleishman was a man of approximately 80 years of age; that at all times herein involved said Joseph Fleishman was sick and infirm, but not disabled, . . ."

After June, 1950, David continued for a time to pay various amounts to Rachel but nothing to Joseph. All other moneys which have accumulated under the trust agreement are being held by David, under a mutual agreement of the parties, to await the outcome of this litigation.

■ The trial court found that David and Frances held said four-fifths interest "for the benefit of said Joseph Fleishman and the plaintiff in intervention, Rachel Fleishman, his wife, *until such time as Joseph Fleishman became disabled or died,* and thereupon for the *sole* benefit of said Rachel Fleishman." (Emphasis added.) It is apparent that David and Frances were required to decide if and when Joseph became "disabled." This power was discretionary in them and there is no evidence or finding of fraud, bad faith or abuse of discretion on their part. Section 2269 of the Civil Code provides: "A discretionary power conferred upon a trustee is presumed not to be left to his arbitrary discretion, but may be controlled by the proper court if not reasonably exercised, . . ." The trial court evidently found that David and Frances had reasonably exercised their discretion in this respect because it did not charge them with the payment which was made to Rachel in June, 1950. ■ The judgment only requires David and Frances to account for and deliver over to Joseph's representatives his share of the rents "*since* June, 1950." The trial court charged David and Frances with the payment made to Rachel in July, 1950, and the payments made to her thereafter. This is consistent with the finding that Joseph "repudiated and revoked said oral agreement with the defendants David Blechman and Frances Blechman in June, 1950, and demanded of said defendants

David Blechman and Frances Blechman that they convey to him all of his interest in said real property, . . .'' Joseph's complaint was not filed until June 29, 1950, and copies thereof could not have been served upon David and Frances until thereafter. Although the exact date of the June, 1950, payment by David to Rachel does not appear in the record, it is reasonable to assume that it was made before such service.

This being so, the record supports the implied finding of the trial court that the June, 1950, payment to Rachel was made in good faith and upon reasonable cause and that, for this reason, David and Frances should not be charged therewith. But, after notice of the revocation of the trust, David and Frances would be chargeable with further payments to Rachel, even though made in good faith and in the reasonable belief that Joseph was disabled. However, they should be entitled to reimbursement from Rachel's estate for the total amount thereof. This is all that David and Frances directly have at stake in this litigation. They have not asked for compensation for their services as trustees.

### WAS THE TRUST REVOKED?

Rachel claims that it was not and that, therefore, she became entitled to the entire trust upon Joseph's death. The trial court found that Joseph revoked the trust ''in June, 1950.'' The only evidence in the record of such revocation is that Joseph filed his verified complaint herein on June 29, 1950, in which he claimed the property in its entirety, free and clear of any other claim or interest, and prayed for a decree quieting title in him alone. David testified that he was served with a copy of this complaint. He and Frances filed their answer to the complaint on July 22, 1950.

Section 2280 of the Civil Code provides in part as follows: ''Unless expressly made irrevocable by the instrument creating the trust, every voluntary trust shall be revocable by the trustor *by writing filed with the trustee.*'' (Emphasis added.) We think that any writing which clearly manifests an intention of the trustor to revoke is a sufficient writing under this section. (See 54 Am.Jur. 80, Trusts, § 77.) The complaint served this purpose. We conclude that the record supports the finding of revocation within the meaning of the statute, based upon the filing and serving of the complaint and the answer of the trustees ''to the complaint on file herein.'' This was sufficient written notice to them of the revocation of the trust and it thereupon became their

duty to wind up and terminate the trust, render an accounting and convey the trust estate to whoever was rightfully entitled thereto.

Moreover, the delivery of a formal written notice of revocation to David and Frances, prior to the filing of suit, would have been an idle act on Joseph's part, which the law does not require. (Civ. Code, § 3532.) Their answer pleaded that the trust was "irrevocable" and it is quite clear from the record throughout that they would not have acknowledged Joseph's right to revoke whether they were or were not served with a formal notice of revocation prior to suit.

### DID JOSEPH BECOME "DISABLED" OR INCOMPETENT?

Appellants contend that Joseph became "disabled" by at least June, 1950, within the meaning of that term as used in the trust agreement. Joseph contends that he was not then or ever disabled and the trial court so found. There is sufficient evidence in the record, in addition to the presumption of competency, to support this finding. One of Joseph's daughters testified that he collected the rents and managed the property on Pierce Street right up to the time of his death. This property was a three-story building containing twelve apartments and, according to Rachel's testimony, required a great amount of personal supervision.

The same answer applies to the contention that Joseph could not effectively revoke the trust because he was mentally incompetent. There was a conflict in the evidence which was resolved by the trial court in favor of the presumption of competency and the other evidence in support thereof.

### WAS IT NECESSARY FOR RACHEL TO JOIN IN OR CONCUR IN THE REVOCATION OF THE TRUST?

Rachel argues that, in order to effectively revoke the trust, it was necessary that she join in the revocation. We do not agree. Joseph acted as the trustor in the creation of the trust with the full knowledge and consent of Rachel. The oral agreement of trust was between Joseph, as trustor, and David and Frances, as trustees. Joseph and Rachel were cobeneficiaries under the trust but not cotrustors. Under such circumstances, the revocation of the trust agreement by Joseph alone was as effective as though joined in by Rachel. Even assuming that Joseph did not have authority from Rachel to revoke the trust, he did have authority in his capacity as trustor to revoke insofar as his own separate interest therein was concerned and such revocation would

necessitate a termination of the trust, at least as to that interest. In such event, it would require a determination of the respective interests of Joseph and Rachel in the trust res. Rachel's death has made the question as to whether the trust continued as to her interest, following Joseph's revocation, moot.

## WAS THE ISSUE OF REVOCATION BEFORE THE COURT?

The trial court found that the trust was revocable and had been revoked by Joseph. Appellants contend that the issue of revocation was not before the court. We think it was.

 The complaint alleged a cause of action to quiet title in Joseph and the prayer asked that it be declared that he "is the owner" of the property. This is a proper type of action to determine the validity of any adverse claims based upon asserted trusts. (Code Civ. Proc., § 738; *Butterfield* v. *Graves,* 138 Cal. 155, 158 [71 P. 510]; *Truesdail* v. *Lewis,* 45 Cal.App.2d 718, 721 [115 P.2d 218.) The answer of David and Frances alleged that they owned a one-fifth interest outright and held title to the remaining four-fifths as trustees under an "irrevocable" trust. These allegations are deemed controverted. (Code Civ. Proc., § 462.) Among the issues raised by said answer was the issue as to whether David and Frances had the right to retain title to said four-fifths interest or whether title to such interest should be quieted in Joseph. This necessarily required not only a determination of whether the trust was revocable or irrevocable but also, if revocable, whether it had been revoked. Joseph's right to a decree quieting title could be defeated on either of these two grounds and, by necessary implication, both were placed in issue by the answer. It would seem obvious that, if the trial court found that the trust was revocable, it must then also determine whether the trust was still in existence or whether it had been revoked. Only by so doing could it determine in whom to quiet title to said four-fifths interest.

## THE INTEREST OF RACHEL

The total purchase price of the property, inclusive of incidental closing costs and expenses, was $53,245.06. David and Frances contributed $5,300 and $27,000 was loaned by a building and loan association upon the security of a deed of trust upon the property, executed by David and Frances. The trial court found that the balance, $20,945.06, was put up by Joseph.

The findings upon which the judgment against Rachel is based are as follows: ''That the portion of the purchase price paid by Joseph Fleishman [$20,945.06] consisted of moneys which were the sole and separate property of said Joseph Fleishman; that the plaintiff in intervention, Rachel Fleishman, paid no part of the consideration for said real property and owns no interest in said real property.''

The sum of $20,945.06 was made up of the following items:

$ 1,000.00—withdrawn on February 13, 1947, from savings account no. 1316 in Bank of America, McAllister-Fillmore Branch, in names of ''Rachel Fleishman or Frances Blechman.'' (initial payment under deposit receipt agreement)

4,000.00—withdrawn on February 20, 1947, from same account (no. 1316) to complete required deposit.

4,700.00—withdrawn on May 1, 1947, from account no. 1316.

10,000.00—withdrawn on May 1, 1947, from savings account no. 20179 in The San Francisco Bank, in names of ''Rachael Leah Fleischman or Frances Blechman.''

800.00—cashier's check dated May 1, 1947, issued by Bank of America, Arguello-Geary Branch, payable to ''Josef Fleishman.''

445.06—personal check of Bowen A. Bridges, dated May 1, 1947, drawn on Bank of America, Arguello-Geary Branch.

$20,945.06

To recapitulate, of the $20,945.06 which the trial court found was contributed by Joseph, $9,700 came from account numbered 1316, Bank of America, McAllister-Fillmore Branch, standing in the names of ''Rachel Fleishman or Frances Blechman,'' $10,000 came from account numbered 20179, The San Francisco Bank, standing in the names of ''Rachael Leah Fleischman or Frances Blechman,'' and $1,245.06 came from two unsecured loans of $800 and $445.06, made by Bridges to Joseph.

Frances has never claimed any interest in either of the two accounts and both were closed out by the respective withdrawals of $4,700 and $10,000.

Rachel's pleadings and her testimony were that the funds in the Bank of America (account no. 1316) were those of herself and Joseph jointly and that the funds in The San Francisco Bank (account no. 20179) were her sole and separate property. She testified that this was in accordance with

Joseph's desires and their mutual understanding. It is apparent, however, that the trial court did not believe her. Her interest is obvious and her testimony was conflicting in some respects. Even though no witness directly contradicted her, the trial court was not required to accept her testimony as the truth. (See *Blank* v. *Coffin*, 20 Cal.2d 457, 462 [126 P.2d 868].)

However, disregarding Rachel's testimony entirely, the record in this case requires a reversal of the judgment against Rachel.

 The $800 item in the ''breakdown'' detailed above came from a loan obtained by Bowen A. Bridges from the Bank of America, Arguello-Geary Branch. The $445.06 item was found by the trial court to be ''an advance by Bowen A. Bridges on the personal credit of Joseph Fleishman.'' (Bridges was the real estate broker who handled the sale.) No finding was made as to the credit upon which the $800 loan was made. The proceeds of these two loans, totaling $1,245.06, are presumed to be community property and the community acquired an interest thereby in the proportion which such sum bears to the total contribution, to wit, 1,245:20,945, or approximately 1/17th. There is no evidence in the record to rebut this presumption.

In *Gudelj* v. *Gudelj*, 41 Cal.2d 202 [259 P.2d 656], the husband bought a one-fourth interest in a cleaning business for $11,500. He made a down payment of $1,500 from separate funds and executed a note for $10,000. The trial court found that the entire interest was his separate property. The judgment was reversed, the Supreme Court holding that that part of the payment for the interest which was represented by the note was community property. The court said that ''the character of property acquired by a sale upon credit is determined according to the intent of the seller to rely upon the separate property of the purchaser or upon a community asset. [Citing authorities.] In the absence of evidence tending to prove that the seller primarily relied upon the purchaser's separate property in extending credit, the trial court must find in accordance with the presumption.'' (P. 210.) The presumption referred to is that property acquired on credit during marriage is community property.

In the instant case, there likewise was no evidence as to what credit the lender relied upon in making the loans. The trial court found that the $445.06 loan was upon the personal credit of Joseph but there is no evidence to support this

When the initial deposit of $1,000 was made, Bridges' salesman accompanied Joseph and Rachel to the bank, where *she*, not he, drew out the money from an account standing in the names of herself and daughter. When the sale was closed at the title company, some month later, Bridges was there and it was Rachel who produced and endorsed cashier's checks payable to *her* in the amounts of $10,000 and $4,700, respectively. The title company's closing record shows the receipt of these checks. It also shows that the sum of $445.06 was needed to close and that Bridges gave his personal check for this amount. Bridges must have known that Joseph was not taking title to the property in his name but that David and Frances were and that they had an individual interest therein. There not only is no evidence to support the finding that Bridges loaned the money on the personal credit of Joseph but what evidence there is would indicate that this was not so.

As before pointed out, the trial court had the right to disbelieve the testimony of Rachel that Joseph had given her the money which was in the account at The San Francisco Bank, even though there was no witness who contradicted her, Joseph having died before trial. But where the evidence shows without conflict that a husband has voluntarily caused funds to be put into an account standing in the name of the wife there is a presumption that he intends such funds to be the separate property of the wife. There is nothing in the record to rebut this presumption. In *Cash* v. *Cash*, 110 Cal. App.2d 534 [243 P.2d 115], a husband knowingly deposited his separate funds in a bank account standing in the names of himself and his wife as joint tenants. In a divorce action between them, the trial court found that the account was the separate property of the husband. The judgment was modified on the ground that there was no evidence to support the finding. This court said, at page 538: ''He knowingly deposited his separate property in the joint tenancy account. The form of the account created a joint tenancy. That constituted a gift to his wife. While it is true that, as between husband and wife, at least while both are still alive, and the contest is between them, parol evidence is admissible to show an agreement that they intended that what appears to be joint tenancy property was to be the separate property of either or the community property of both, for this rule to apply there must be some relevant evidence of an agrement between the parties. The opening of a joint tenancy bank account by husband and wife creates a rebuttable presumption that the

money therein is joint tenancy property. Either may rebut this presumption, but in the absence of rebutting testimony the presumption must prevail. These principles are well settled. [Citing authorities.]

"In the instant case there is no evidence at all that the parties intended that the joint account should be other than what it purports to be. It is true that respondent testified that originally most of the moneys going into the account were his separate property, but that falls far short of proving an agreement that it was to remain his separate property. Evidence as to the source of the funds standing alone, cannot rebut the presumption that the account was intended to be what it states it is—a joint tenancy account. In the instant case, neither the actions nor the words of the parties rebut the presumption. That being so, the presumption must prevail. The finding contrary to it is unsupported."

In the instant case, there is likewise no evidence to rebut the presumption that the money in The San Francisco Bank account was Rachel's sole and separate property. Indeed, the same would be true as to the account in the Bank of America had it not been for the testimony of Rachel that this account belonged to them jointly. It may well be that, if Joseph had been alive at the time of trial, he could have rebutted the presumption, but this does not affect the record as presented on this appeal.

In the Cash case, *supra*, this court was able to modify the judgment by ordering the joint tenancy account involved therein to be divided equally between the parties. But the state of the record in this case is such that we cannot ascertain with any accuracy the proportionate interest of Rachel and Joseph. One example of this is the confusion arising as to the source of funds which went into the purchase of an interest in certain real property on McAllister Street in San Francisco, which was bought and sold during the marriage. The funds resulting from the sale of this property apparently went into the purchase of the Irving Street property. Another example concerns the disposition of the rents from the properties on Divisadero and on Pierce Streets, which properties were admittedly the separate property of Joseph.

Accordingly, that portion of the judgment against Rachel which holds that she has no interest in the trust estate is reversed and the lower court is instructed to retry this issue. That portion of the judgment establishing the one-fifth interest of David and Frances and decreeing that they hold the

remaining four-fifths interest in trust and are required to render an accounting for the period since June, 1950, is affirmed. That portion of the judgment requiring them to transfer the trust estate to Joseph's representatives is modified by providing that they are to transfer such interest to whoever is ultimately determined to be entitled thereto. In the interests of justice, each of the parties is to bear his or her own costs on appeal.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied February 28, 1957.