Filed 8/30/19

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MARGARET PENA, as Trustee, etc., | C083266 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 34201500178593) |
| GREY DEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Steven M. Gevercer, Judge. Affirmed.

Law Office of Dewey V. Harpainter, Dewey V. Harpainter and Nathan R. Harpainter for Defendant and Appellant.

F.S. Ricky Maveety for Petitioner and Respondent.


In this case, we must determine whether James Robert Anderson, settlor and trustee of the James Robert Anderson Revocable Trust (the trust), validly amended the

trust when he made handwritten interlineations to one of the operative trust documents, specifically the First Amendment to the trust (First Amendment), making Grey Dey a beneficiary.  After making the interlineations, Anderson sent both the original trust instrument and the interlineated First Amendment to his attorney to have the new disposition of his trust estate formalized in a second amendment to the trust.  Anderson died before the formal amendment was prepared for his signature.

Margaret Pena, successor trustee, petitioned the trial court for instructions as to the validity of the interlineations.  She thereafter moved for summary judgment, asserting the interlineations did not amount to a valid amendment to the trust as a matter of law.  The trial court granted the motion and entered judgment in Pena's favor. Dey appeals.

We conclude the interlineations did not validly amend the trust because the trust specifically requires amendments "be made by written instrument *signed by the settlor* and delivered to the trustee."  (Italics added.)  While the law considers the interlineations a separate written instrument, and while there can be no doubt Anderson delivered them to himself as trustee, he did not sign them.  Instead, he sent them to his attorney to have them formalized into a second amendment to the trust and prepared for his signature, evidencing his intent to sign the changes to his trust at a later date.  We also reject Dey's argument that Anderson effectively signed the interlineations by attaching a Post-it® note to the documents he sent to his attorney, on which he stated: "Hi Scott, [¶] Here they are. First one is 2004.  Second is 2008.  Enjoy!  Best, Rob."  We cannot conclude these lines on the note were part of the written instrument comprised of the interlineations to the First Amendment to the trust such that the signature on the note effectively signed the interlineations.  Instead, Anderson signed a separate note indicating what the enclosed documents were.  While there is no dispute in this case that Anderson intended Dey to receive a portion of his trust estate, there is also no genuine dispute that Anderson

2

intended to sign this and other changes to his trust when formalized by his attorney. Unfortunately, he died before that could be accomplished. We must therefore affirm the summary judgment entered in this case.

## FACTS

In 2004, Anderson executed the trust at issue in this appeal. He was designated both settlor and trustee. Paragraph 3.1 of the trust provides: "Power of Revocation and Amendment. This trust may be amended, revoked, or terminated by the settlor, in whole or in part, at any time during his lifetime. After the settlor's death, this trust shall be irrevocable and not subject to amendment." Paragraph 3.2 provides: "Method of Revocation or Amendment. Any amendment, revocation, or termination of this trust shall be made by written instrument signed by the settlor and delivered to the trustee. An exercise of the power of amendment substantially affecting the duties, rights, and liabilities of the trustee shall be effective only if agreed to by the trustee in writing."

In 2008, Anderson executed the First Amendment to the trust in compliance with the foregoing method of amendment. We need not set forth the contents of this amendment in any detail. It will suffice to note the amendment added paragraph 5.5, dividing the remainder of the trust estate into shares of various percentages for 15 named beneficiaries.

Anderson was diagnosed with abdominal cancer in 2010. While he recovered from that bout with the disease, he was diagnosed with brain cancer the following year. Dey moved in with Anderson in November 2011 and cared for him until his death in May 2014. Dey and Anderson had been friends since 2006. Anderson, a successful artist and art teacher, was also Dey's mentor in the art world. The two became close during 2010 and throughout Anderson's battle with cancer.

3

In February 2014, Anderson called an attorney, Michael S. Shuttleworth, who had represented Anderson in another matter, seeking his assistance in making changes to his estate planning documents. Because Shuttleworth was not the attorney who drafted the 2004 trust instrument or the 2008 First Amendment, he asked Anderson to send copies of these documents to his office and "put in writing the proposed changes he was considering."

Around this time, Anderson made the interlineations at issue in this appeal. Eleven of the fifteen shares provided for in paragraph 5.5 of the First Amendment were crossed out. The first 4 shares remained, but these beneficiaries' respective percentages of the remainder (49 percent) of the trust estate were changed to 7 percent. Dey and two other individuals were listed in the margin as also receiving "7% of 49%," i.e., 7 percent of the remainder of the trust estate. Also in the margin, Anderson wrote, "51% to 3 organizations ~ See beneficiary list."

Shuttleworth received the trust instrument and interlineated First Amendment to the trust in March 2014. As mentioned, attached to these documents was a Post-it® note, on which Anderson wrote: "Hi Scott, [¶] Here they are. First one is 2004. Second is 2008. Enjoy! Best, Rob." An initial draft of a second amendment to the trust was prepared by Shuttleworth's staff. However, Shuttleworth's review of that draft caused him to call Anderson the following month seeking clarification as to some of the requested changes. Anderson was out of town and said he would get back to Shuttleworth the following week.

Anderson was admitted to the hospital the same day as this phone call. He died May 24, 2014. A final draft of the second amendment to the trust was never finalized or signed by Anderson.

4

DISCUSSION

## I

### *Summary Judgment Principles*

We begin by summarizing several principles that govern the grant and review of summary judgment motions under section 437c of the Code of Civil Procedure.

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) "[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is entitled to judgment as a matter of law." (*Id.* at p. 850.) This burden "remains with the party moving for summary judgment." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 (*Kahn*).) The moving party also "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he [or she] carries [the] burden of production, . . . the opposing party is then subjected to a burden of production . . . to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

On appeal from the entry of summary judgment, "[w]e review the record and the determination of the trial court de novo." (*Kahn*, *supra*, 31 Cal.4th at p. 1003.) And, of course, the de novo standard of review also applies to questions of statutory construction (*County of Los Angeles v. American Contractors Indemnity Co.* (2011) 198 Cal.App.4th 175, 178) and to the interpretation of written instruments, including a trust instrument, unless the interpretation depends on the competence or credibility of extrinsic evidence or a conflict in that evidence (*Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 452-453).

5

## II

### *Analysis*

Dey contends the trial court erred in concluding Anderson's interlineations did not validly amend the trust. He argues the interlineations manifest an unambiguous intent to amend and, either standing alone or in conjunction with the Post-it® note attached to the trust documents Anderson sent to his attorney, effectively amended the trust as a matter of law. We are not persuaded.

"Unless the trust instrument provides otherwise, if a trust is revocable by the settlor, the settlor may modify the trust by the procedure for revocation." (Prob. Code, § 15402.)[1] The Probate Code sets out the following procedure for revocation: "A trust that is revocable by the settlor or any other person may be revoked in whole or in part by any of the following methods: [¶] (1) By compliance with any method of revocation provided in the trust instrument. [¶] (2) By a writing, other than a will, signed by the settlor or any other person holding the power of revocation and delivered to the trustee during the lifetime of the settlor or the person holding the power of revocation. If the trust instrument explicitly makes the method of revocation provided in the trust instrument the exclusive method of revocation, the trust may not be revoked pursuant to this paragraph." (§ 15401, subd. (a).)

Under these provisions, a revocable trust may be revoked, in whole or in part, (1) by the method provided for in the trust instrument, or (2) by a writing, other than a will, signed by the settlor or person holding the power of revocation; either method may be used unless the trust instrument explicitly makes its method of revocation exclusive. (*King v. Lynch* (2012) 204 Cal.App.4th 1186, 1192.) The same procedure applies to

---

[1]     Undesignated statutory references are to the Probate Code.

modifications, "unless the trust instrument provides otherwise." (*Id*. at pp. 1190, 1192.) "Thus, if the trust instrument is silent on modification, the trust may be modified in the same manner in which it could be revoked, either statutorily or as provided in the trust instrument. In that case, the trust instrument does not *provide otherwise*." (*Id*. at p. 1192.) Where, however, the trust instrument does specify how the trust is to be modified, as in this case, "that method must be used to amend the trust. As noted by the court in *Conservatorship of Irvine* (1995) 40 Cal.App.4th 1334, 1344, . . . 'section 15402 recognizes a trustor may bind himself or herself to a specific method of modification or amendment of a trust by including that specific method in the trust agreement.' " (*King*, *supra*, 204 Cal.App.4th at p. 1193.)

Here, the trust instrument provides any amendment to the trust "shall be made by written instrument signed by the settlor and delivered to the trustee." We must therefore determine whether the interlineations Anderson made to the First Amendment to the trust satisfy this method of amendment.

Beginning with the "written instrument" language, we find *Cory v. Toscano* (2009) 174 Cal.App.4th 1039 (*Cory*) to be instructive. There, certain interlineations to a trust document reduced a beneficiary's share of a trust asset. That beneficiary proposed to challenge the interlineations as an ineffective amendment to the trust and sought an advance ruling as to whether or not such a challenge would constitute a challenge to the trust itself, and thereby violate the trust's no contest clause. (*Id*. at p. 1041.) Without determining whether or not the interlineations constituted an effective amendment to the trust, our colleagues at the Fifth Appellate District held the proposed challenge to the interlineations was not a challenge to the trust instrument, i.e., the instrument containing the no contest clause, and therefore would not violate that clause. (*Id*. at pp. 1044-1046.) Rejecting the argument that "the handwriting is physically part of the Trust instrument and has no meaning without incorporating the relevant Trust provisions," the court

explained, "the handwritten notations on the Trust were made after the Trust was executed" and therefore "are not part of the original Trust instrument and thus are not part of the instrument containing the no contest clause." (*Id*. at p. 1045.) The court continued: "Moreover, the handwritten interlineations meet the definition of an 'instrument.' They are a 'writing that designates a beneficiary or makes a donative transfer of property.' [Citation.] The fact that this writing is physically part of, and must be read in the context of, the original Trust instrument does not change its status as an instrument 'other than the instrument containing the no contest clause.' [Citation.]" (*Ibid*.)

We agree with this analysis. While we are not called upon to determine the precise issue addressed in *Cory*, *supra*, 174 Cal.App.4th at page 1045, we similarly conclude the interlineations in this case constitute a written instrument separate from the trust instrument. We also have no difficulty concluding the interlineations were "delivered to the trustee," as required by the trust's amendment provision. As both settlor and trustee, Anderson delivered the interlineations to himself when he made them. (See, e.g., *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882, 888 (*Gardenhire*) [settlor-trustee's execution of a will effectively revoking her trust was sufficient to provide herself with notice of intent to revoke].) The problem is Anderson did not sign the interlineations. Because the trust's amendment provision requires an amendment be "signed by the settlor," we must conclude the interlineations did not effectively amend the trust.

Nevertheless, relying on two holographic will cases, *Estate of Archer* (1987) 193 Cal.App.3d 238 and *In re Finkler's Estate* (1935) 3 Cal.2d 584, Dey argues Anderson validly adopted his 2008 signature on the First Amendment to the trust when he made the interlineations to that document in 2014. Not so. These cases support the proposition that handwritten interlineations made to a holographic will or codicil after that instrument

8

was signed, when made with testamentary intent, become part of that will or codicil and adopt the original date and signature. (*Estate of Archer*, *supra*, 193 Cal.App.3d at p. 244; *In re Finkler's Estate*, *supra*, 3 Cal.2d at pp. 600-601; see also *In re Dumas' Estate* (1949) 34 Cal.2d 406, 411 ["additions or alterations may be made in a holographic will if done in the testator's handwriting, without the necessity of resigning and redating"].) Dey cites no authority, nor have we found any on our own, applying these holographic will principles outside of that specific context, let alone the context of an attempted amendment to a trust.

Such authority does not exist for good reason. In the context of a holographic will, "the signature and the material provisions [of which] are in the handwriting of the testator" (§ 6111), subsequently added handwritten interlineations become part of that signed holographic will. The holographic will and handwritten interlineations become a single testamentary document, the whole of which is to be judged under section 6111. (See *Estate of Archer*, *supra*, 193 Cal.App.3d at p. 243 [rejecting the argument that handwritten additions to a holographic will must be formally integrated or incorporated by reference in the will in order to adopt the will's original signature, noting, "integration and incorporation apply only to *separate writings*"].) In contrast, as we have explained, handwritten interlineations on a trust document are a separate writing regardless of the fact that "this writing is physically part of, and must be read in the context of, the original Trust instrument." (*Cory*, *supra*, 174 Cal.App.4th at p. 1045.) The trust instrument in this case requires such an amendatory writing to be signed by the settlor. This signature requirement would be rendered nugatory if the settlor could simply adopt the signature on the original trust instrument.

We are also unpersuaded by Dey's argument that the Post-it® note Anderson attached to the 2004 and 2008 trust documents he sent to his attorney supplies the missing signature. That note stated: "Hi Scott, [¶] Here they are. First one is 2004.

9

Second is 2008. Enjoy!  Best, Rob."  We cannot conclude these lines on the note were part of the written instrument comprised of the interlineations such that the signature on the note effectively signed the interlineations.  Instead, the Post-it® note is a separate writing that simply identifies the enclosed documents.  Indeed, Anderson sent these documents, along with the interlineations, to his attorney to allow Shuttleworth to prepare a formal second amendment to the trust for his signature, as contemplated by the amendment provision in the trust.  If Anderson intended the interlineations and signature on the Post-it® note to amend the trust by themselves, there would have been no need to have Shuttleworth prepare the amendment for his signature.

Finally, Dey's reliance on *Gardenhire*, *supra*, 127 Cal.App.4th 882 and *Fleishman v. Blechman* (1957) 148 Cal.App.2d 88 (*Fleishman*) is misplaced.  In *Gardenhire*, the trust instrument provided the settlor (Pulizevich) may revoke the trust by written notice signed by the settlor and delivered to the trustee (also Pulizevich).  (*Gardenhire*, *supra*, at p. 886.)  As previously stated, section 15401, subdivision (a), provides that a revocable trust may be revoked either (1) by the method provided for in the trust instrument, or (2) by a writing, *other than a will*, signed by the settlor or person holding the power of revocation.  The Sixth District Court of Appeal held Pulizevich revoked the trust by executing a will disposing of all of her real and personal property.  The appellate court explained: "We agree with the trial court that because Pulizevich did not limit or qualify the term 'written notice,' she authorized revocation via *any* writing that unambiguously manifested her intent to revoke, including a will.  We find significant support for such broad latitude in the fact that she named herself the trustee.  The trust allowed Pulizevich to revoke simply by giving herself written notice of her intent to do so.  Since she could not be mistaken about her own intent no matter how she chose to manifest it in writing, the broad, unqualified language of the trust reasonably implies that she did not intend to restrict the form of written notice or the nature of the documents used to provide

10

it. Rather, any writing that unambiguously manifested her intent would do." (*Id*. at p. 888.)

Unlike *Gardenhire*, where the written instrument manifesting the settlor's intent to revoke the trust (i.e., the will) was signed by the settlor, here, the interlineations made to the First Amendment to the trust were not signed. Even more inapposite is *Fleishman*, *supra*, 148 Cal.App.2d 88, where the Second District Court of Appeal held the settlor effectively revoked a trust by filing a lawsuit against the trustees in which he claimed the trust property in its entirety. (*Id*. at p. 95.) The revocation question in that case was governed by former section 2280 of the Civil Code, providing: "Unless expressly made irrevocable by the instrument creating the trust, every voluntary trust shall be revocable by the trustor by writing filed with the trustee." (Repealed Stats. 1986, ch. 820, § 7, p. 2730; see Prob. Code, §§ 15000, 15401, 15410.) The court explained: "We think that any writing which clearly manifests an intention of the trustor to revoke is a sufficient writing under this section. [Citation.] The complaint served this purpose." (*Ibid*.) Thus, the trust at issue in *Fleishman* did not require a *signed* writing to revoke the trust; here, Anderson's trust explicitly provided any amendment to the trust "shall be made by written instrument *signed by the settlor* and delivered to the trustee." (Italics added.) As we have explained, Anderson did not sign the interlineations he made to the trust documents.

In sum, the undisputed evidence establishes Anderson made interlineations to the First Amendment to the trust and sent this document, along with the original trust instrument, to his attorney with the intent to have the interlineated changes incorporated into a second amendment to the trust, which he intended to sign upon the completion of that document. Unfortunately, he died before that could be accomplished. While we must construe a trust instrument, where possible, to give effect to the intent of the settlor, that intent "must be ascertained from the whole of the trust instrument, not just separate

11

parts of it." (*Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168.)  Dey asks us to give effect to the intent expressed in the interlineations.  However, the manifest intent expressed in the trust instrument itself, stated explicitly in its amendment provision, is that a written instrument must be signed in order to constitute a valid amendment to the trust.  Because Anderson did not sign the interlineations, they did not effectively amend the trust.

DISPOSITION

The summary judgment in favor of respondent, Margaret Pena, as successor trustee of the James Robert Anderson Revocable Trust, is affirmed.  Respondent Margaret Pena, as successor trustee of the James Robert Anderson Revocable Trust is entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


                                          /s/
                                    HOCH, J.



We concur:



          /s/
MURRAY, Acting P. J.



          /s/
DUARTE, J.