UNION NATL. BANK OF LITTLE ROCK, TRUSTEE *v.* SMITH

5-3726                                        400 S. W. 2d 652

Opinion delivered February 28, 1966
[Rehearing denied April 18, 1966.]

*Chowning, Mitchell, Hamilton & Burrow;* By: *W. P. Hamilton, Jr.,* for appellant.

*L. A. Hardin* and *W. J. Walker,* for appellee.

CARLETON HARRIS, Chief Justice. On September 7, 1962, appellee, Dr. Frank C. Smith of Little Rock, established an inter vivos trust, naming the Union Na-

tional Bank of Little Rock, appellant, as trustee, and specifically declaring the trust to be irrevocable. The doctor transferred and delivered certain promissory notes secured by real estate mortgages, and certain securities, to the trustee, as the original corpus of the trust. Under the provisions of the instrument, income is reserved to Dr. Smith, and upon his death, the income is to be paid to his wife, Abrielia, during her lifetime. Following the death of Dr. Smith and wife, income from the trust is to be paid to Dr. Smith's daughter, Delores Brown, and her husband, James Brown, in equal shares for life. Upon the death of either Mr. or Mrs. Brown, the survivor is to receive all income for life. Upon the death of the survivor, under the terms of the instrument, the income is to be paid in equal shares to three named children of Mrs. Brown, and following the death of the last of the children, the trust will terminate, and the principal and income shall be paid to the First Pentecostal Church; if that church is not in existence at the time of the termination of the trust, the principal and income shall be paid to the United Pentecostal Church, St. Louis, Missouri.

On September 15, 1964, appellees (Dr. Smith and wife) instituted suit against appellant and the successive beneficiaries, seeking revocation of the instrument, alleging that the trust violated the rule against perpetuities,[1] and further alleging that Dr. Smith was under the influence of narcotics at the time of the execution of the trust to such an extent that he did not understand the provisions thereof, and was mentally incompetent to execute the agreement. Appellant answered with a general denial, and asked that the complaint be dismissed. The case proceeded to trial, and at the conclusion of the evidence, the court held that Dr. Smith was mentally incompetent, did not have sufficient mental capacity to execute the trust agreement of September 7, 1962, and the trust agreement was voided, cancelled, and set aside.

---

[1]This point was not urged at the trial below, and is not relied upon here.

From the decree so entered, appellant brings this appeal.

First, let us review the applicable law in a situation of this nature. In *Harris* v. *Harris,* 236 Ark. 676, 370 S. W. 2d 121, a fairly recent case, the court reiterated the rule that has been expressed many times in the past:

"There is a presumption of law that every man is sane, fully competent and capable of understanding the nature and effect of his contracts. The burden of proving incompetency rested with the appellee, since he seeks to void the signing of these deeds. In *Hunt* v. *Jones,* 228 Ark. 544, 309 S. W. 2d 22, this court said:

" 'Since the sanity and mental capacity of Miss McCray to make the deeds in question is presumed, the burden rested on the appellants to show her mental incapacity to execute them by a preponderance of the evidence. *Gibson* v. *Gibson,* 156 Ark. 528, 246 S. W. 845. As this court said in *Pledger* v. *Birkhead,* 156 Ark. 443, 246 S. W. 510: "The familiar principles of law applicable to cases of this kind have often been announced by this court. If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what consideration, then he possesses sufficient mental capacity to execute such instrument. Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting his own interest in dealing with another is all the law requires. If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him." [Citing cases]'

"In the *Hunt* case, Miss McCray had executed two deeds, one in 1953 and one in 1954, which conveyed property owned by her. In 1954, at the age of 86, she died a few months after signing the last deed. Numerous col-

lateral heirs attempted to have these deeds cancelled on the ground of her mental incompetency. Miss McCray also suffered from the disease of arteriosclerosis. Sometimes her mind was clear and at other times she was noisy, belligerent, and mentally confused. Her deeds were held valid.''

The court also said:

''The true test of Quincy's competency in this case is what was his mental capacity or competency when he signed the deeds on March 28, 1961. No witness who observed him on that date testified that Quincy appeared incompetent then.* * * ''

With this firmly established rule in mind, let us proceed to examine the evidence. Amis Guthridge, a Little Rock attorney, testified that he had known Dr. Smith for approximately twenty years, and that the doctor called him with regard to preparing a trust agreement. Smith came to his office, brought with him notes concerning what he wanted the trust to provide, and told Guthridge that he desired to have the trust officer of the Union National Bank named trustee. The doctor told Guthridge that he wanted to execute an irrevocable trust. The lawyer stated that he talked to Dr. Smith very seriously and very carefully about the finality of an irrevocable trust. However, the doctor had made up his mind, and he told Mr. Guthridge that the reason he wanted to establish this trust ''was that there were so many malpractice suits wherein patients would sue doctors that it had gotten to the point where you could hardly prescribe aspirin for a patient until whereby you might be faced with a malpractice suit and he wanted to do it for that reason to protect what he had and also for the protection of his wife in the event he should pass away and I called Mr. Jerry Bowen and I remember very distinctly when I told him Dr. Smith wanted to make an irrevocable trust, he said, quote, 'Amis, we do not like to make an irrevocable trust.' ''
According to the witness, this visit by Dr. Smith to the

office was on Saturday, September 1, 1962. The trust instrument was ready for execution on Friday, September 7, and Guthridge turned the trust agreement over to the doctor, and made an appointment with Bowen for Dr. and Mrs. Smith to meet with the former at some time during the day. Guthridge himself had an engagement in Fayetteville, and accordingly was not present at the bank when the trust instrument was discussed. The lawyer further testified that Dr. Smith appeared to fully understand how he was disposing of his property, and the matter was discussed fully. The doctor had several pages of handwritten notes, and a detailed account of all his properties. He appeared to know to whom he was transferring the property, their names, and their addresses. Guthridge stated that the doctor appeared in a state of urgency, very anxious that the matter be completed.

Mr. Guthridge stated that, much to his amazement, within a short number of days, Dr. Smith called and told the lawyer over the phone that he (Smith) was not getting from the trust what he had thought he would receive in the way of payments, and he desired that the instrument be changed. It appeared that Dr. Smith had been under the impression that he would get the principal payments as well as the interest payments from two particular promissory notes, and under the trust agreement, the doctor would only receive the interest. After the two conferred with Bowen, the latter became convinced that Dr. Smith had undoubtedly thought that he would obtain the principal, and Bowen agreed to make the change. Guthridge stated that sometime later, Dr. Smith contacted him and wanted the trust revoked.[2] He said that Dr. Smith was very distraught and upset, and

[2]From the testimony: "I can't give you the time except to me it would have to be a brief period of time due to the fact that I definitely remember he said that ever since it has been made that his wife had cried day and night and that would not have been a period over three or four or six or eight months. To my mind it was a short period of time but as to how long, I don't know."

was utterly despondent; that the doctor would call him several times a day relative to the matter.

J. H. Bowen, Vice-President and Trust Officer of the Union National Bank of Little Rock, testified that his first contact with Dr. Smith occurred at the time of the execution of the trust agreement on September 7, 1962. Bowen had had previous conversations with Mr. Guthridge concerning the trust, and on September 7 Dr. Smith, with his wife, came to Bowen's office and had a long discussion relative to the trust agreement. Bowen explained the fact that an irrevocable trust cannot be terminated, and Dr. Smith gave the same reason for desiring to establish the trust, *viz*, that he was in fear of malpractice suits. According to the witness, the doctor went over the various provisions of the trust very thoroughly, and had with him the notes and the investment trust shares, which were to constitute the corpus of the trust.[3] In Smith's presence, the assignments of the notes, liens securing the notes, and assignment of the investment trust shares, were prepared. Bowen testified that the doctor appeared familiar with his properties, and that the trustor mentioned that, in addition to what he was then putting into the trust, he was considering selling the house that he occupied, and placing the proceeds from the sale in the trust. Bowen stated that the conversation with Smith, and the time consumed in preparing the various assignments took about an hour and a half, and that during that period, the parties talked about nothing but business and the trust. Subsequently,

---

[3]There were two promissory notes in the approximate amount of $24,000.00 and 8,088.01 shares of Crown Western Investment, part of which were registered in the name of Dr. Smith, and part in the name of Mrs. Smith. Bowen inquired why Mrs. Smith did not join as one of the grantors of the trust, since she was actually putting some property into it, but the Smiths explained that they desired to handle the matter in this manner. The value of the stock at that time was something over $55,000.00. The income only was to be deposited to the bank account of the Smiths, but Item Five authorizes and directs the trustee to pay to the first party (and successive beneficiaries) from the principal, if necessary, for increased living costs. "Living costs would be determined by the trustee, by comparing living costs as of the date of the execution of this trust agreement with living costs at any future date."

Guthridge told Bowen that the doctor had felt that the trust was not in accord with his (Smith's) understanding, and they discussed the propriety of making a change. Bowen testified that he came to the conclusion that the instrument did not properly express Dr. Smith's intention as to the two notes (previously referred to), in that Smith had actually intended to be able to draw the principal from the notes, as well as the interest. This phase of the trust agreement was then re-written, and a full record made of what had happened, including the reason for making the change.

Bowen testified that he first heard of Smith's desire to revoke the trust along in the late spring or early summer of 1963, when Guthridge told him that Dr. Smith had been in his (Guthridge's) office, and wanted to revoke the trust instrument. Smith called Bowen once on the telephone, stating that he wanted to revoke the trust, but was advised by the bank officer that this could not be done.

Gene Barlow, an employee of the Trust Department of Union Bank, testified that Dr. Smith came to his desk in August, 1962, and stated that he wanted to talk about establishing a trust, and questioned Barlow about the difference between an irrevocable and a revocable trust. This was explained to him, and the doctor said that he was worried about his funds, and about malpractice suits. Barlow advised him to consult a lawyer. Barlow subsequently handled the disbursement of the trust funds to Dr. Smith, and he testified that the doctor called and stated the amount he was receiving was not as much as he had expected it to be. Barlow told Smith to take the matter up with Bowen. The witness testified that he had no further contact with Smith until October, 1963, when the doctor expressed his desire to revoke the trust.

Dr. Charles Norman McKinzie testified that he attended Dr. Smith on December 27, 1962. He stated that Smith complained of losing weight, and of having lost

his appetite, and McKinzie placed him in St. Vincent's Hospital. Dr. McKinzie stated: "My examination at that time revealed an elderly man who would appear to be younger than seventy, lying in bed and quite co-operative." He testified that Smith was normal and rational, and did not appear to have been under the influence of narcotics.

Dr. Drew Agar, of Little Rock, testified that he examined Dr. Smith on December 28, 1962, at the hospital. He stated that Smith's muscle movement, body movement, and speech movement, were perfectly normal; that Smith was alert and cooperative, but complained of pain. Agar testified that he could not see any indication of Smith's being under the influence of drugs, nor did the patient indicate to Agar that he was an addict. The examining physician attributed Smith's weight loss to the loss of appetite, and the loss of appetite, according to Agar, was caused by the rather severe pain that one suffers from shingles. Agar testified that Smith had had the shingles, and at the time of the examination, some rash remained on the lower part of the patient's right chest and abdomen.

Six acquaintances of Dr. Smith testified in his behalf. Roy Bell, who handles securities, testified that he sold the Crown Western shares, mentioned in the trust agreement, to Dr. and Mrs. Smith, and that he had known them for twenty-five or thirty years. Mr. Bell said that Dr. Smith appeared to be sick during the year 1962. However, he stated that the doctor was practicing at that time. In reply to the question of whether he thought Smith was competent to transact business, the witness stated:

"Well I believe, I don't know, I believe I could have stuck any kind of paper in front of him and told him, 'Doc, this is it, I want your signature,' and he would have signed it."

Bell did not attempt to pinpoint any particular period during 1962.

Coy Andrews was a cab driver, and stated that he had known Dr. and Mrs. Smith about fifteen years; that during 1962 and 1963, he had quite a bit of contact with the two as they would call for taxi service. He testified that he would take them to eat, and that, at times, after ordering food, they would get up and leave without eating it; that at times they would pay him; at other times they wouldn't, and that on some days they appeared to be confused. Most of the witness' testimony seemed to refer to the year 1963, and when asked their condition in 1962, Andrews replied, "Well I just, I don't remember just exactly." He stated that, in 1962, there were some days when they acted normal, and other days that they did not, and he could not say what their condition was on September 7, 1962.

S. W. McGuran testified that he had known the Smiths for around twenty-five years, and had been very close to them. He stated that he would visit with appellees, perhaps every two weeks, and he did not recall any time in 1962 when Dr. Smith did not appear to know what he was doing; in fact, the witness said that it was not until 1964 that Dr. Smith appeared to be "shook up."

Mrs. Mike Bartello stated that she visited the Smiths during 1962, and thought Dr. Smith was sick. She said he appeared "kind of fuzzy like." When asked if she could state his condition in September, 1962, Mrs. Bartello replied, "Well that I don't know. It was about the middle of 1962 I have an idea when I was over there last. As far as September, I would not say for sure."

Mrs. Gladys McGuran testified that she had known the Smiths since 1953, and had worked in their home between 1957 and 1963 at different times. When asked about his condition in 1962, Mrs. McGuran replied, "At times he was a normal, rational man, a very fine man. At other times he was a very sick man."

Fred Newth, a Little Rock attorney, testified that

Dr. Smith came to his office in the latter part of September, 1962, stating that he was dissatisfied with the trust agreement that had been prepared. Newth said that the doctor was nervous, and complained of difficulty with his daughter, stating that he had loaned her some money, and she would not repay it, and appellee wanted to draw a new will, excluding the daughter.[4] Mr. Newth stated that Dr. Smith asked him in 1963 to try and revoke the trust, but he (Newth) told the doctor that it could not be revoked. Newth prepared a will for Dr. Smith in 1963, in which Mrs. Brown was omitted as a beneficiary, but explained to Smith that he did not think the instrument would have the force or effect of superseding the trust, and he did not charge for preparing it.

It will be noted that the testimony from these witnesses is somewhat contradictory. On one point, however, all are in accord, i.e., they were unable to state the condition of Dr. Smith on September 7, 1962.

Probably the strongest testimony offered by appellee is that of Mr. Eugene Warren, attorney for the Arkansas Medical Board for the past fifteen years. Mr. Warren is also attorney for the Drug Control Division of the State Board of Health, and likewise attorney for the State Board of Pharmacy. According to his testimony, the State Medical Board was given direct supervision of narcotic problems, involving addiction, dispensing, and abuse by physicians, and he was designated as a member of a team formed between the State Medical Board and the Federal Bureau of Narcotics (through their agent in charge). Mr. Warren's duty was to handle the legal end of drug control cases where physicians were involved as addicts, or were charged with abuse of the Food and Drug Act or the Federal Barbiturate Act. Relative to the investigation of Dr. Smith, Warren stated that about February 14, 1964, Dr. Smith's daughter (Mrs. Brown) came to Little Rock, and discovered

---

[4]This was Mrs. Brown, the daughter who is the beneficiary in the trust agreement.

her father and Mrs. Smith in a helpless condition. She reported this fact to the Pulaski County Medical Society. In response thereto, Dr. Thomas D. Honeycutt went to the Smith home, noted the condition of the Smiths, suspected that drugs were involved, and immediately called Warren. The Smiths were removed to the hospital, and the Federal Bureau began its investigation.[5] Under both State and Federal law, a wholesaler, selling a dispensing physician narcotics, must keep a record of the sales. Records were checked, and the witness was furnished a copy by one of the agents of the Narcotics Bureau. Warren testified:

"I have in my file a report from the investigator of the Division of Food and Drug Control giving the amounts of Butisol Sodium Elixir. This is one of the barbituric acid compounds. It is the trade name purchased by Dr. Smith from the period of May the 9th, 1962—I am reading from the records of the State Medical Board—until January the 28th, 1964.* * *

"From May 9, 1962, to January 28, 1964, Dr. Smith purchased forty-eight gallons of Butisol Sodium Elixir.

"* * * There are 378.533 grains of barbituric acid in each gallon of Butisol Sodium Elixir. This is 379 grains, about a grain and a half to a teaspoon. There were twenty months involved. Dr. Smith purchased 18,192 grains of Butisol Sodium Elixir in this period of time. * * *

"* * * This amounts to thirty grains a day average."

* * *

"The information we received, which the entire medical profession became knowledgeable of this particular—this is sort of a new thing, new field of this barbiturate, addiction to barbituric. It comes from the Addiction Center of the Public Health Service Hospital

---

[5] Warren stated that Smith had the worst addiction in the history of the state.

at Lexington. They tell us according to their research and tests—they tell us this in releases and pamphlets and so forth—that between the level of eight and ten grains per day, if a person takes any of the barbituric acid compounds over a period of time, consisting of three to four weeks, that he or she will become addicted at the level of eight to ten grains per day. \* \* \*

"\* \* \* This drug—the person who takes it develops a tolerance. You can't get addicted until you get a tolerance and you start off—let me go back. At first the Public Health people thought that these barbiturics were just habit forming. There is a difference between habit forming and actual addiction. If the ordinary person took the amount he was taking or he said he was taking, speaking of Dr. Smith, they could not live. You build up this tolerance through a long period of taking and the tolerance itself then requires more of a dose and in order to have some effect, and this in turn brings on the addiction, which in turn brings on the characteristics of the addiction which is much more dangerous we are told than Class A Narcotics."

Mr. Warren then made certain calculations by dividing the number of days into the number of gallons. He testified that Dr. Smith purchased 27.7 grains a day in 1962. He stated that both Smith and his wife were addicts, and he did not know how much each one consumed; however, he subsequently stated that Smith took 13.85 grains per day in 1962: "We had to develop this in order to show how much he had increased his tolerance to explain his complete collapse in '64." As stated, this testimony was entirely the result of compilations, since Warren stated that he had no proof at all as to the consumption in 1962, and the 1962 compilations were based upon the investigation made in 1964, and Smith's condition in 1964.

Most of Dr. Honeycutt's testimony dealt with the physical and mental condition of the Smiths in 1964, and, of course, there is no question but that appellees were

addicted at that time. The doctor had no knowledge of the amount of drugs that had been consumed by Dr. Smith and his wife during 1962, and he had no knowledge as to Smith's mental ability in 1962.

Dr. Honeycutt stated:

"In this particular type of barbiturate, I am sure that thirteen grains a day probably represents about all they can get in. By that I mean this: It still is a sedative and sleep producer whereas in comparison to morphine or demarol or one of the opiates that is not necessarily a sleep producer, a person could take fifteen, twenty grains of morphine intravenously and be staggering and wall-eyed for a few minutes but he could still go on. But thirteen grains a day, he is going to sleep a fair portion of the day even though he has been taking it and built up a tolerance to it."

He added that when not sleeping, "No doubt he would be cloudy. His speech would be somewhat slurred. He would not be able to manipulate his hands and do fine chores and tasks and write and things of that sort."

Dr. Smith testified that he had previously, in 1958, been admitted to the State Hospital at his own request, because of taking barbiturates (Nembutal and Elixir of Butisol), and stayed there for a week or two. He testified that about two months later, he started taking drugs and continued to do so until he was placed in the hospital in 1964. The doctor recalled the trust agreement, which was executed on September 7, 1962, *i.e.*, he remembered going to the bank to establish the trust, but stated that he recalled little else about it. Dr. Smith did say that he remembered giving Amis Guthridge instructions to prepare a trust agreement. Appellee testified that his present principal complaint is that he doesn't seem to get enough money from the trust to live on.

On September 2, 1960, he and his wife obtained a divorce, at which time she received the Crown Western

investment shares which were subsequently placed in the trust by Mrs. Smith. (Dr. and Mrs. Smith remarried on October 6, 1960.)

Mrs. Smith testified that she started taking drugs in 1961, and that she did not recall signing over the securities to Dr. Smith, which she had obtained in the divorce settlement of September, 1960. She stated that she and Dr. Smith had both made a will, and that the manner in which the property was bequeathed was different from the provisions in the trust. She said that the trust beneficiaries are not the people that appellees desire to receive the money; also, that she did not know the exact balance in the bank account, but she had withdrawn $10,000.00 in August, and opened a new account under her name.

Let us proceed to evaluate the evidence. As previously mentioned, while there is testimony by appellees' witnesses that the Smiths acted abnormally at times in 1962—there is also testimony by most of these same witnesses that they acted normally at times in 1962. However, there is positively no evidence that Dr. Smith was incompetent or irrational on September 7, 1962, the date of the execution of the instrument. In fact, the only persons who testified relative to Smith's appearance and manner on that date were appellant's witnesses, and they testified, without equivocation, that the doctor appeared entirely normal. The evidence of Mr. Warren, as noted, was based on the amount of sales to Dr. Smith, which commenced in May, 1962, and upon the doctor's physical condition in 1964. Further, based on compilations, it was concluded that Dr. Smith took 13.85 grains per day in 1962. Admittedly however, this amount was partly reached by assuming that Dr. Smith and his wife had consumed all that had been purchased. This assumption was based upon the fact that no record of his dispensing the drugs to other people could be found. This is, of course, somewhat speculative, for Dr. Smith could have dispensed drugs without making any record. For that matter, he could have decided on par-

ticular occasions that he would not take any more, and have thrown away what he had on hand; then changed his mind within a few days, and purchased additional gallons. This, too, is speculative, but the point is that the drug could have been disposed of by means other than Dr. Smith's taking it. Not only that, but admittedly both the doctor and his wife were taking the drug, and she was in as bad, if not worse, physical and mental condition than her husband in 1964, when they were taken to the hospital. Of course, no one is able to say how much was consumed by Dr. Smith, and how much by Mrs. Smith. Dr. Honeycutt stated that 13 grains would be about all that an individual could take in a day (the estimate showed that Dr. Smith had taken 13.85 grains per day), and that one taking that much would sleep a good portion of the time, even though he had built up a tolerance; that his speech would be slurred, and he would be unable to manipulate his hands, or write. Yet, the testimony does not reflect that Dr. Smith was so affected on September 7, 1962, or during the preceding days when he was consulting with his attorney about setting up the trust. To the contrary, the only thing Mr. Guthridge noticed, that was in any way out of the ordinary, was that Dr. Smith "seemed in a state of urgency, very anxious and pushing me to complete it. * * * He was at a fever pitch, and driving."

Though it would appear under the evidence that Dr. Smith's condition worsened in 1963, still the evidence reflects that he made a will—apparently, from the testimony, a will that entirely expressed his wishes and desires as of that date. Of course, he appeared entirely cognizant of the terms of the trust, even in 1963, and was seeking advice relative to setting it aside.

Perhaps the most pertinent and significant evidence in the entire case consists of a written memorandum, prepared by Dr. Smith, which he turned over to Attorney Guthridge at the time of their consultation with regard to preparation of the trust agreement. This, with the exception of two or three notes placed on it by

Guthridge, is entirely in the handwriting of Dr. Smith, and sets out in detail his properties, including notes, mortgages, names of debtors, amount of original debt, amount of current debt, dates of payments, legal description of real property, the Crown Western investment shares (even noting some purchased as late as June, 1961), and his account number at the bank. The trust beneficiaries are also set out in detail. Dr. Smith had not dated the memorandum, and Guthridge dated it himself. Counsel for appellees argue that the date when Dr. Smith prepared the memorandum is not shown, and "there is absolutely no evidence to negate the possibility that the doctor was helped or influenced in the preparation of these notes." But, of course, the burden was on appellees to establish any undue influence, or that the notes were prepared, or dictated, by someone else. There is not one scintilla of evidence in the entire record that any beneficiary had anything to do with the preparation of this memorandum, or influenced Dr. Smith in any way to establish a trust, or for that matter, no evidence that any beneficiary even knew that he was contemplating the execution of such an instrument.

Summarizing, in order to set aside the trust agreement, it was necessary that appellees establish Dr. Smith's incompetency on September 7, 1962. As set out in this opinion, we do not feel that that burden has been met. To the contrary, we think the proof reflects that Dr. Smith was competent to execute the trust agreement.

Reversed.