615 P.2d 271

In the Matter of the ESTATE of William Grady HEAD, Deceased.

Amelia D. POPPE and Guinevere E. Brady, Claimants-Appellants,

v.

Esther TAUTE, Claimant-Appellee,

and

Albuquerque National Bank, Personal Representative and Trustee-Appellee.

No. 4359.

Court of Appeals of New Mexico.

July 3, 1980.

Writ of Certiorari Denied Aug. 1, 1980.

Arthur H. Coleman, Coleman & Marino, P. C., Albuquerque, for claimants-appellants.

Bruce P. Moore, Santa Fe, for claimant-appellee Taute.

## OPINION

SUTIN, Judge.

The trial court entered an Order that "The Revocable Trust Agreement between William Grady Head and Gertrude Head; his wife as 'Trustors' and the Albuquerque National Bank dated June 15, 1977 is declared to be valid and binding upon the parties hereto; however, the purported First Amendment is void and of no force and effect . . . ." The Revocable Trust Agreement gave a 40% interest to each of the Heads' natural daughters, Amelia D. Poppe and Guinevere E. Brady (Poppe-Brady) and a 20% interest to Esther Taute (Taute) whom the Heads had raised. The Taute interest had been removed by the First Amendment and the Order of the trial court served to restore the 20% interest. Poppe-Brady appeal. Taute cross-appealed for failure of the trial court to allow all of her costs. We reverse as to the Poppe-Brady appeal and affirm as to the Taute appeal.

The trial court found:

For some years prior to his death on October 2, 1978, at the age of 87 years, Mr. Head had been mentally incompetent from time to time. He enjoyed what had been described as "good days," i. e., days of competency.

Mr. Head was mentally "competent" on the following dates and events:

(a) June 8, 1965, the date he executed his Will.

(b) March 2 and 22, 1976, the date Mr. Head executed a General Power of Attorney to Mrs. Head to act on his behalf.

(c) June 15, 1977, the date he executed the Trust Agreement, deeds and instruments of conveyance.

Mr. Head was mentally "incompetent" on the following dates and events:

(a) June 21, 1977 (six days after the Trust Agreement), when the First Amendment was executed which removed the 20% Taute interest.

(b) July 14, 1977, when Mrs. Head ratified the First Amendment under her power of attorney.

Mrs. Head died on April 23, 1978, some five months before Mr. Head.

The trial court concluded that the First Amendment was void and that Taute was restored her 20% interest in the Trust Agreement.

The three main issues are:

(1) Was Mr. Head mentally competent on June 21, 1977, the date the amendment was executed?

(2) If not, was he mentally competent on July 14, 1977, the date Mrs. Head executed the ratification?

(3) If not mentally competent at either event, did the Trust Agreement and Pow-

er of Attorney grant Mrs. Head the power to make the Amendment effective.

A. *On June 21, 1977, Mr. Head was of sufficient mental capacity to execute the Amendment.*

Mr. Head was competent when the Trust Agreement was executed on June 15, 1977. A few days thereafter, Mrs. Head contacted Stanley Sager, attorney for herself and Mr. Head, and advised the attorney that she and Mr. Head did not want Taute to have anything.

Mr. Sager told her that Deborah Goncalves, his legal assistant, would come to her home and repeated:

"Let me know when Mr. Head is having a good day, not a bad day, and I'll send Debbie out."

The amendment was prepared and, on June 21, 1977, Deborah took the instrument to the Head residence for signature. The attorney felt that no problem existed about sending Deborah out on a "good day" because she was an experienced individual. She met with Mr. and Mrs. Head. Mr. Head said "Hello" and sort of "kidded around." He made a comment about how tall she was. Mrs. Head read the document and told Mr. Head this was the instrument she had told him about. Mr. Head looked at the document and signed it. Deborah testified that nothing indicated Mr. Head was out of touch with the nature of the subject matter under discussion, or that he did not know what he was doing, or that he was incompetent. Deborah acknowledged his signature.

*Mr. Sager testified that the First Amendment was a valid and binding instrument.*

We reviewed the testimony of three doctors and four witnesses presented by Taute and find nothing to support the trial court's finding that Mr. Head was not competent at the time of the execution of the First Amendment on June 21, 1977. Taute relies primarily on the testimony of Dr. Don F. Seelinger, a neurologist. Dr. Seelinger examined Mr. Head at Presbyterian Hospital on July 26, 1977, about five weeks after the Amendment was signed. His hospital consultation record made no reference to Mr. Head's mental condition on June 21, 1977. *Dr. Seelinger was not asked whether Mr. Head had a "good day" or a "bad day" on June 21, 1977, the day the Amendment was signed.* He was specifically questioned about the execution of the Trust Agreement. He was asked these questions to which he gave these answers:

Q. [C]ould you tell this Court with any degree of certainty whether Mr. Head, *some six weeks prior,* could have validly executed a Trust document?

A. [I]t's not possible to state absolutely that he could or could not have, but I found inconsistency, and still do, with the history given by his wife and the daughter.

Q. Now that's the part that confuses me a little bit, Doctor. *Based solely on your objective findings, you tell me you cannot state with certainty whether he could or could not execute that document on that particular day at that time, isn't that true?*

A. *That is correct.* [Emphasis added.]

From other testimony, we are convinced that Dr. Seelinger would be unable to present substantial evidence that Mr. Head was mentally incompetent on June 21, 1977, the date the Amendment was signed. He was asked this question to which he gave this answer.

Q. Doctor, if this was a steadily progressing bilateral brain condition, would you anticipate that *five weeks earlier* he would have been in very little different condition than when you saw him?

A. Well he was sick when I saw him, *so I saw him at low tide.* And when I said he had limited cerebral reserve, what I was saying was that brain function was off, and by history markedly impaired, and that grew worse in unfamiliar surroundings and grew worse with illness. [Emphasis added.]

Based upon this testimony and the law there was no substantial evidence to support the trial court's finding that Mr. Head was mentally incompetent on June 21, 1977, the date he executed the First Amendment.

The question before us is:

Did Mr. Head, at the time he executed the First Amendment, have sufficient mental capacity to understand the consequences and effects of the same?

■ The test of mental capacity is whether a person is capable of understanding in a reasonable manner, the nature and effect of the act in which the person is engaged. *Jackson v. Pillsbury*, 380 Ill. 554, 44 N.E.2d 537 (1942); *Kimmell v. Tipton*, 142 S.W.2d 421 (Tex.Civ.App. 1940); *Harrison v. City National Bank of Clinton, Iowa*, 210 F.Supp. 362 (S.D.Iowa 1962); *Turner v. Cole*, 116 N.J.Eq. 368, 173 A. 613 (1934).

■ To invalidate a trust instrument, mental incompetency must be operative at the time of the execution of the instrument. *Union National Bank of Little Rock v. Smith*, 240 Ark. 354, 400 S.W.2d 652 (1966); *Creek v. Union Nat. Bank in Kansas City*, 266 S.W.2d 737 (Mo.1954); *Davren v. White*, 42 N.J.Eq. 569, 7 A. 682 (1887). The presumption is in favor of competency. To show the contrary, the burden of proof rests on him who so alleges to establish the same by clear, satisfactory and convincing proof. *Harrison, supra. Leonard v. Leonard*, 234 Iowa 421, 12 N.W.2d 899 (1944); *Stephenson v. Stephenson*, 247 Iowa 785, 74 N.W.2d 679 (1956); *Taylor v. Howett*, 39 Del.Ch. 569, 170 A.2d 917 (1961); *Webb v. St. Louis County Nat. Bank*, 551 S.W.2d 869 (Mo.App. 1977); *Fleishman v. Blechman*, 148 Cal.App. 88, 306 P.2d 548 (1957); *Turner, supra.*

The reason the presumption of competency exists is due to the fact that mental incompetence is a condition of degree. It may vary from idiocy to almost ordinary mental strength.

■ Mr. Head was not a person of strong, healthy intellect. His mental powers were to some extent impaired. This had been his condition from time to time. But the fact that the mind is disordered or diseased as to any one of its parts, or, that its healthy operation is in any function disturbed, is not a mental incompetence which affects the whole mind. If the peculiar phase of mania had no influence upon the act brought into question, such act is not in law invalidated. It would not render Mr. Head legally incompetent, incapable of entering into a civil contract, execute a trust or an amendment thereof.

"[T]he mental disease causing insanity has no definite boundary at which a person loses capacity. Thus, one may have capacity to make a will without having capacity to conduct an intricate business transaction. *Even where there is a pronounced mental incompetency, there may be ratification of previously executed transactions during lucid intervals.* The matter is too amorphous for a statement of a definite rule." [Emphasis added.] Restatement 2d Agency § 122, comment d, p. 311 (1958).

In *Jensen v. Kisro*, 547 S.W.2d 65 (Tex. Civ.App.1977), Mrs. Jensen executed a power of attorney on January 20, 1964. On October 21, 1970, the agent sold 300 shares of stock in reliance on the power of attorney. At 4:00 a. m. that morning, Mrs. Jensen, 80 years of age, was readmitted to the hospital. "She was very sick. Toxic. Confused." She was totally incapacitated and unable to communicate as a result of an acute illness. In reversing a summary judgment for plaintiff, the court quoted at length from Restatement, supra, and adopted the language of 2A C.J.S. *Agency* § 141a, p. 761 (1972). The court held that on October 21, 1970, Mrs. Jensen did not lack mental capacity to sell the stock.

The question is not whether the mind of Mr. Head was in anywise affected or impaired, but whether he, at the time of signing the First Amendment, was enjoying a lucid interval. Admitting that Mr. Head was subject to some delusion, or that his mind was in some faculty impaired, it does not mean that he lacked a lucid interval at the time he signed the First Amendment. The action of the unimpaired faculties of the mind will supply a lucid interval. Al-

though the mental power may be reduced below the ordinary standard, yet, if there be sufficient intelligence to understand and appreciate the act, the mental ability to execute the instrument remains, and the execution thereof is valid. It is enough if the mental faculties retained sufficient strength to comprehend the act to be done.

The presumption of competency was not overcome. This presumption was supported by the testimony of Sager and Deborah and by the rule that an adjudication of insanity is at most presumptive evidence as to the mental capacity of a person at the time of a transaction. *Losh v. Winters Nat. Bank & Trust Co.*, 46 N.E.2d 443 (Ohio App.1942). The strength of the presumption is lessened in proportion to the remoteness of the adjudication. *Jones v. Schaffner*, 193 Iowa 1262, 188 N.W. 787 (1922).

Dr. Seelinger's testimony did not establish any fact, nor any reasonable inference to be drawn therefrom, that Mr. Head was incompetent or had a "bad day" on June 21, 1977, the date the First Amendment was signed. To judicially determine whether Mr. Head was, in a legal sense, mentally incompetent, we must have facts upon which Dr. Seelinger would have formed an opinion. He did not examine Mr. Head on June 21, 1977; neither was he present. He would not know whether Mr. Head had a "good day" or a "bad day," or whether he had a lucid interval. If a person's mind is affected or impaired, the question is whether he, at the time of the execution of the instrument, was enjoying a lucid interval. "Even a lunatic may make a will or a sale of property in a lucid interval." *Murray v. Barnett National Bank of Jacksonville*, 74 So.2d 647 (Fla.1954).

For Dr. Seelinger's testimony to be effective, he would have had to testify that Mr. Head could not have had a lucid interval at the time he signed the First Amendment.

When we view a Trust Agreement and Amendment thereto executed within six days of each other, it is illogical to hold one valid and the other invalid if we accept medical testimony of mental incompetence,

general in time sequence, that does not focus on any lucid intervals. It is logical to find one instrument valid and the other invalid if evidence is strong and convincing in nature that a lucid interval occurred on one occasion and not the other. Even if we do not accept the testimony of Sager and Goncalves, the presumption is that on June 21, 1977, Mr. Head was mentally competent. This presumption was not overcome.

Written instruments executed by persons merit a presumption of validity as a matter of public policy unless interested persons who attack them produce evidence and facts to the contrary that are relevant and substantial of a convincing nature.

It is undisputed that Mr. Head had "good days" and "bad days." Mr. Sager testified that the Amendment was a valid and binding document. His legal assistant's testimony indicated that Mr. Head had a "good day." We have found no evidence, facts or inferences of a convincing nature that Mr. Head had a "bad day" on June 21, 1977.

In any event, we have not found substantial evidence to support the trial court's finding that Mr. Head was mentally incompetent on June 21, 1977, the date the Amendment was executed.

### B. *The Trust Agreement was ratified on July 14, 1977.*

On July 14, 1977, Emma Head as attorney-in-fact for Mr. Head executed a Ratification of Trust Agreement. It reads:

The undersigned, EMMA HEAD, hereby ratifies and confirms all of the terms and conditions set forth in that certain Trust Agreement dated the 15th day of June, 1977, in which Emma Head and William Grady Head are Trustors, and The Albuquerque National Bank is Trustee; this ratification being made for and on behalf of William Grady Head by the undersigned as his attorney-in-fact pursuant to a power of attorney dated the 22nd day of March, 1976, a copy of which is attached hereto.

The trial court found that "Mr. Head was not competent at the time of the ratifica-

tion of the Trust Agreement by Mrs. Head pursuant to the Power of Attorney of March 22, 1976, on July 14, 1977." Based upon the reasons given under Point A, we can find no substantial evidence to support this finding. The power having been exercised by Mrs. Head as agent during the competency of Mr. Head, as principal, the ratification was valid.

Neither Taute nor the court questioned the power of Mrs. Head to ratify the Trust Agreement some 21 days after the Amendment was signed. Did Mrs. Head have the power to do so even though Mr. Head was mentally incompetent on July 14, 1977?

On March 22, 1976, Mr. Head, who was then competent, executed a General Power of Attorney to Mrs. Head. It reads in pertinent part:

> The undersigned, WILLIAM GRADY HEAD . . . does hereby make, constitute and appoint EMMA GERTRUDE HEAD, as his true and lawful attorney, for him and in his name, place and stead, to do and perform any and all acts which the undersigned might do for himself, intending hereby to give to the said EMMA GERTRUDE HEAD his general power of attorney, *without limitations* within the period stated below.
>
> \* \* \* \* \* \*
>
> The undersigned hereby ratifies and confirms all that the said attorney-in-fact shall lawfully do or cause to be done by virtue of this General Power of Attorney.
>
> This Power of Attorney shall continue in force and effect until revoked by means of a written revocation filed in the office of the County Clerk of Bernalillo County, New Mexico. [Emphasis added.]

Paragraph 6 of the Trust Agreement provided in pertinent part:

> . . . During the lifetime of the Trustor EMMA GERTRUDE HEAD . . . her written instructions to the Trustee shall prevail upon and be binding upon the Trustee *as to all matters concerning the trust estate* . . . . [Emphasis added.]

We have before us a General Power of Attorney granted Mrs. Head "without limitation" mandated to continue in force and effect until revoked, and a Trust Agreement that gave her full power to bind the Trustee "as to all matters concerning the trust estate." These broad and expansive powers transformed Mrs. Head from a "naked agent" for Mr. Head into a principal who could act in her own name with reference to any amendment, revocation or ratification of the Trust Agreement regardless of the mental competency or incompetency of Mr. Head.

The Power of Attorney was acknowledged before Deborah Goncalves and was never revoked.

We have been referred to § 45–5–501, N.M.S.A.1978 of the Probate Code which provides for power of attorney not affected by disability. It reads in pertinent part:

> Whenever a principal designates another his attorney-in-fact or agent by a power of attorney in writing and the writing contains the words, "This power of attorney shall not be affected by disability of the principal," or "This power of attorney shall become effective upon the disability of the principal," *or similar words showing the intent of the principal that the authority conferred shall be exercisable notwithstanding his disability, the authority of the attorney-in-fact or agent is exercisable by him as provided in the power on behalf of the principal notwithstanding later disability or incapacity of the principal* . . . .. All acts done by the attorney-in-fact or agent pursuant to the power during any period of disability . . . have the same effect . . . of and bind the principal . . . as if the principal were alive and not disabled. . . . [Emphasis added.]

Our research does not disclose any cases decided under this section in any jurisdiction that has adopted the Uniform Probate Code. The National Conference of Commissioners on Uniform Laws in 1979, approved the "Uniform Durable Power of Attorney Act" which is identical to the approved amended Part V of the Uniform

Probate Code. No states, as yet, have adopted this statute. The Commissioners' Prefatory Note states:

. . . The only requirement is that an instrument creating a durable power contain language showing that the principal intends the agency to remain effective in spite of his later incompetency.

In an instrument of this character, it is encumbent upon us to constantly keep in view the nature and purpose of the instrument to be construed and the intention of the person who grants the authority. *Watkins v. Hagerty*, 104 Neb. 414, 177 N.W. 654 (1920).

In 1976, it was known to Mr. and Mrs. Head that due to the age of Mr. Head and the mental deterioration that accompanies it, they believed that the best interest of Mr. Head would be served by delegating his power to his wife to act "without limitation." This power was carried forward in the Trust Agreement on June 15, 1977. We believe that a power granted a wife to act "without limitation" are "similar words showing the intent of the principal that the authority conferred shall be exercisable notwithstanding . . . later disability or incapacity of the principal." " '[D]isabled' . . . is often applied in the law to physical as well as mental capacity." *Jensen, supra*, 547 S.W.2d 67. It logically follows that the purpose of the General Power of Attorney and the Trust Agreement, both prepared by lawyers and pursuant to legal advice, was to grant Mrs. Head, during the lifetime of Mr. Head, such power to act as to avoid litigation such as that which occurred in this case. In effect, § 45–5–501 replaces the common law power of attorney coupled with an interest.

■■ A power of attorney is revoked by operation of law upon an adjudication of insanity. *In re Berry's Estate*, 69 Misc.2d 397, 329 N.Y.S.2d 915 (1972); *Dann v. Sands*, 38 A.D.2d 661, 327 N.Y.S.2d 222 (1971); *Jackson v. Hall*, 139 Kan. 832, 32 P.2d 1055 (1934); *Harrington v. Bailey*, 351 S.W.2d 946 (Tex.Civ.App.1961); *Evans v. York*, 217 S.W.2d 749 (Mo.App.1949), unless the power is irrevocable. If the agent's authority is "coupled with an interest" the principal's insanity does not terminate the agency. *Witherington v. Nickerson*, 256 Mass. 351, 152 N.E. 707 (1926); *McNerney v. Aetna Life Ins. Co.*, 130 N.Y.S.2d 152, 284 App.Div. 21 (1954), aff'd, 308 N.Y. 916, 127 N.E.2d 79 (1955); *Johnson v. National Bank of Mattoon*, 320 Ill. 389, 151 N.E. 231, 44 A.L.R. 1306 (1926); *Mid-City Federal Savings & Loan Ass'n of Phila. v. Allen*, 413 Pa. 174, 196 A.2d 294 (1964). Annot., *What constitutes power coupled with interest within rule as to termination of agency*, 28 A.L.R.2d 1243 (1953). As *Witherington, supra*, said:

If a principal becomes insane before the agent has performed his undertaking, the agency is terminated or suspended by operation of law, except in the cases where a consideration has previously been advanced so that the power became coupled with an interest . . . .. [152 N.E. 709.]

"Coupled with an interest" means that the agent must have a present interest in the property upon which the power is to operate. There must be a beneficial interest in the thing itself which is the subject of the power. *Wall v. Ayrshire Corporation*, 352 S.W.2d 496 (Tex.Civ.App.1961); *Eduardo Fernandez Y Compania v. Longino & Collins*, 199 La. 343, 6 So.2d 137 (1942); *Harris v. Owens*, 142 Ohio St. 379, 52 N.E.2d 522 (1943); *Bowling v. National Convoy & Trucking Co.*, 101 Fla. 634, 135 So. 541 (1931); *Citizens' State Bank v. E. A. Tessman & Co.*, 121 Minn. 34, 140 N.W. 178, 45 L.R.A.,N.S., 606 (1913). The landmark opinion in this field is Chief Justice Marshall's opinion in *Hunt v. Rousmanier's Administrators*, 21 U.S. 174, 8 Wheat. 174, 5 L.Ed. 589 (1823). See, *In re Ward's Estate*, 47 N.M. 55, 134 P.2d 539 (1943).

■ As a trustor, Mrs. Head had a present existing interest in the trust estate and in the distribution of the property held in trust. It was independent of the power conferred. It was of primary importance that she determine the beneficiaries of the trust. If she desired to restore her community property interest, she could have re-

voked the trust. She had an interest in the subject upon which the power was to be exercised. She had a power of attorney coupled with an interest.

Mrs. Head sought to exercise her power of attorney with reference to the Trust Agreement. A "trust" is the beneficial ownership of property of which the legal title is in another. *Maihack v. Mehl*, 141 N.J.Eq. 281, 57 A.2d 44 (1948); *Lux v. Lux*, 109 R.I. 592, 288 A.2d 701 (1972). Mr. and Mrs. Head were the joint beneficial owners of the trust property. Mrs. Head was a trustor along with her husband. She had the right at any time during his lifetime to amend or revoke the trust. Her Power of Attorney was "coupled with an interest" in the trust estate and was irrevocable. See, *Millman v. First Federal Savings and Loan Ass'n*, 198 So.2d 338 (Fla.App.1967) where a husband gave his wife a power of attorney over a joint savings account in the name of the husband and step-daughter and was subsequently adjudged an incompetent.

The Trust Agreement was validly ratified on July 14, 1977, regardless of the mental competency of Mr. Head.

C. *The trial court did not err in failing to allow appellee Taute all of her costs.*

 On cross-appeal Taute contends that the trial court erred in failing to allow all of her costs.

Rule 54(d) N.M.R.Civ.Proc. provides that ". . . costs shall be allowed as of course to the prevailing party unless the court otherwise directs . . .." As Poppe-Brady have correctly pointed out, Taute did not prevail in all respects at trial. Taute took the position that both the Trust Agreement itself and the First Amendment were void; she thus prevailed only as to the First Amendment.

This Court has held that pursuant to the above-cited rule,

. . . the matter of assessing costs . . . lies within the discretion of the trial court, and an appellate court will not interfere with the trial court's exercise of this discretion in this regard, except in

the case of abuse. *Hales v. Van Cleave*, 78 N.M. 181, 185, 429 P.2d 379 (1967), *cert. denied*, 78 N.M. 198, 429 P.2d 657 (1967).

We find that the trial court did not abuse its discretion in awarding Taute partial costs.

As to the Poppe-Brady appeal, this cause is reversed and remanded to the district court to enter judgment that the First Amendment executed by William Grady Head on June 21, 1977, is valid and that Esther Taute take nothing under her claim.

As to the Taute appeal, the award of costs entered by the district court is affirmed.

Poppe-Brady shall recover their costs in this appeal.

IT IS SO ORDERED.

LOPEZ and ANDREWS, JJ., concur.